[No. 30412. Department One. April 23, 1948.]

THE STATE OF WASHINGTON, *Respondent*, v. LESLIE LEWIS BAKER, *Appellant*.[1]

*Charles M. Stokes*, for appellant.

*Lloyd Shorett* and *John L. Vogel*, for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment and sentence following a verdict of guilty by a jury after a

[1] Reported in 192 P. (2d) 839.

trial had on an information charging appellant with the crime of rape. The information alleged:

"He, the said LESLIE LEWIS BAKER, in the County of King, State of Washington, on or about the 11th day of June, 1947, wilfully, unlawfully and feloniously then and there did perpetrate an act of sexual intercourse with one (here was named the complaining witness) then and there a female person over the age of ten years, not the wife of the said LESLIE LEWIS BAKER, against her will and without her consent, the said (          ) being then and there prevented from offering resistance to said intercourse by fear of immediate and great bodily harm, which she then and there had reasonable cause to believe would be inflicted upon her by said LESLIE LEWIS BAKER."

The complaining witness lives with her son at 1715 east Howell street, Seattle, King county, Washington. Upon entering the house, there is an open stairway going up at the right to two upstairs apartments. Downstairs to the left are three doors; the first door opens into the son's bedroom, the second to the sitting room, and the third to the mother's bedroom. Both of the bedroom doors from the hall are locked; the only entrance to the living quarters being the center door. Inside the living room are doors leading to the bedroom of the son and of the mother. There are two sons, aged twenty and twenty-eight years, only one of whom is living at home. The mother is a practical nurse, working at the King county hospital from seven a. m. to three-thirty p. m. Her testimony was substantially as follows:

She came home in the evening of June 11, 1947. Her son and another boy were working on some coils in the living room. She went to her room, took off her clothes, put on a robe, went to bed and fell asleep. This was around seven or seven-thirty p. m. Sometime later she awoke and saw a man looking for something on top of the chiffonier. Thinking it was her son, she said, "What do you want, honey?" Immediately, the man came over and she could see that he was colored. She was terribly frightened. He put his hand over her mouth pushing her head down hard on the pillow, and whispered, "Don't make a sound, or

I will kill you." He repeated this several times. The complaining witness works in the county hospital, in the department where they bring girls who are injured in such ordeals. She testified that only people who are connected with that work realize how many women are brought in, in pitiful shape, and because of this knowledge, she was terribly frightened.

There is a little stand lamp in the living room, and it was understood between her boy and herself that if either of them went out at night the base of the light would be left on. She saw the light and presumed that the boys had gone out, and that it would be futile to make an outcry. She remonstrated with the man but was afraid not to submit for fear of having her face caved in.

The man threw the covers off of the bed, jerked the gown from her body and threw it. He tore his jacket off and threw it on the floor. He then proceeded to perform a completed act of sexual intercourse. All of this time, she was afraid to make an outcry. Finally she moaned; her son heard her and called. She then screamed. The man struck her a couple of times on the face, and then ran into the living room where he met her son. They struggled for a moment but the man escaped out the front door.

About a half hour earlier, Mrs. Almon, who lives upstairs, opened her door and encountered the appellant. She asked him what he wanted, and he said, "The party I want isn't here," and went downstairs and outside. She followed him down and *closed the door after him.* When she heard the scream, she ran to the head of the stairs and saw appellant running out the front door. Also in the hall was the son and the mother, who did not have anything on and was screaming and hysterical. Mrs. Almon went downstairs and called the police.

The police arrived in a few minutes and found the complaining witness hysterical. The bedroom was in disorder; the radio had been knocked off the table and a chair was overturned, and the bed was torn up. On the floor they found a jacket, in which was a passkey, a key container with two keys, a business card, a little gold cross, and some

small change. The victim was taken to the hospital for treatment.

The mother's testimony about retiring that evening was corroborated by the son and his companion, who left about eleven o'clock. She could not have left the house without going through the living room where they were.

The next afternoon about three o'clock, two police officers were cruising around east John street in a prowl car, when they noticed and stopped appellant and two friends of his, named Starks and Wells. The officers had the jacket with them, showed it to the boys, and asked who had worn it the night before. Wells and Starks said that the appellant had, which he denied. Appellant was taken into custody and searched. He had on his person two keys which were duplicates of the keys found in the jacket. He was not questioned any further that day. The next day Mrs. Almon picked appellant out of the police lineup as the man she had talked to the night before, and whom she later saw running from the house. Appellant then gave the officers a written statement, which was substantially the same as his testimony during the trial.

Appellant's testimony was essentially as follows:

At the time of the occurrence, he was eighteen years old. He had seen the complaining witness three times before, in the vicinity of Twenty-second and Madison, in Seattle, which is a colored neighborhood: the first time, in the Mardi Gras Tavern, drinking beer with a colored woman named Dolly May; the second time, a couple of nights later, on the corner with a short colored man; the third time, and on the night in question, standing on the corner quarreling with a tall colored man. The night of the alleged rape, he left the Mardi Gras about eleven-thirty. She was on the corner alone, the tall colored man having left. When he came along, she asked for a drink, which he gave her. She then asked if he would rather go home with her. When he said that he would, she told him to follow her, which he did. When they got inside the house, he asked for the bathroom, and she pointed upstairs. When he got to the top of the

stairs, a door opened and Mrs. Almon came out and a conversation ensued, as was testified by her.

When he came downstairs, *he closed the door as if going out, but instead went into the lady's bedroom.* She was undressing. He sat in a chair until she was disrobed. He took his jacket off and wanted to remove more of his clothing, but she said not to because he wouldn't be there very long. They then went to bed and performed a completed act of sexual intercourse. He did not threaten her; she did not protest, but was perfectly willing. About that time, a man went by in the hall, and she screamed. He then ran out, leaving his jacket.

In rebuttal, the complaining witness denied that she had ever been in the vicinity of Twenty-second and Madison, and testified that she had never been in a tavern in her life. The proprietor of the Mardi Gras testified that the only time he had ever seen her was when she was brought to him for possible identification, by the officers, after the occurrence.

Rem. Rev. Stat., § 2435 [P.P.C. § 118-181], provides in part as follows:

"Rape is an act of sexual intercourse with a female not the wife of the perpetrator committed against her will and without her consent. Every person who shall perpetrate such an act of sexual intercourse with a female of the age of ten years or upwards not his wife; . . .

"(2) When her resistance is forcibly overcome; or

"(3) When her resistance is prevented by fear of immediate and great bodily harm which she has reasonable cause to believe will be inflicted upon her; . . .

"Shall be punished . . ."

The trial court instructed the jury, in instruction No. 2, as follows:

"To convict the defendant of the offense charged in the Information, the State must prove to you beyond a reasonable doubt:

"(1) That, on or about the 11th day of June, 1947, the defendant, LESLIE LEWIS BAKER, perpetrated an act of sexual intercourse with one (          ), against her will and without her consent;

"(2)   That the resistance of the said (                    ) to such act of sexual intercourse was then and there forcibly overcome or prevented by fear of immediate or great bodily harm which she had reasonable cause to believe would be inflicted upon her;

"(3)   That the said (                  ) was then and there a female person over the age of ten years, not the wife of the said defendant;

"(4)   That the above acts so occurred in King County, Washington.

"If you find from all the evidence admitted in this case that the State has proved beyond a reasonable doubt, each and all of the foregoing elements of the crime charged, then it will be your duty to return a verdict of Guilty as to the crime charged in the Information herein."

The trial court instructed the jury, in instruction No. 4, as follows:

"Rape is an act of sexual intercourse with a female not the wife of the perpetrator, committed against her will and without her consent.   Every person who shall perpetrate such an act of sexual intercourse with a female of the age of ten years or upwards, not his wife—when her resistance is forcibly overcome; or when her resistance is prevented by fear of immediate and great bodily harm which she has reasonable cause to believe will be inflicted upon her—rapes such female.

"The burden is upon the State to prove in this case by the evidence, beyond a reasonable doubt, that the resistance of said (                  ) to the act of sexual intercourse was then and there forcibly overcome or prevented by fear of immediate or great bodily harm which she had reasonable cause to believe would be inflicted upon her.   If you fail to find that her resistance was overcome or prevented by such fear, then you should acquit the defendant.   If the prosecuting witness was not put in such fear, then resistance on her part to the utmost of her capacity would be necessary to constitute rape.   And you are further instructed that the consent of the woman, however reluctantly given, or if accompanied by mere verbal refusal at any time during the intercourse, prevents the act from becoming rape."

■   The question whether the resistance of the complaining witness was prevented by fear of immediate and great bodily harm which she had reasonable cause to be-

lieve would be inflicted upon her, was a question of fact to be determined by the jury. The jury found that her resistance was so prevented; and, from an examination of the record, we are satisfied that the jury could not have arrived at any other conclusion.

■ Error is claimed because of the failure of the state to prove that the complaining witness was not the wife of the appellant. She was a white woman with two sons, aged twenty and twenty-eight years. She testified that she never saw the appellant to recognize him until the day of the trial. From the evidence, the jury was justified in finding, beyond a reasonable doubt, that she was not the wife of appellant.

■ Appellant strenuously contends that there was misconduct on the part of the deputy prosecuting attorney in making the following statements in his closing argument.

"But *if you don't find him guilty* you are going to turn him back on the street and *one of you* or the *wife of one of you gentlemen* are going to wake up some day *and find the same thing happens to you.*" (Italics his.)

"*I am frank to tell you* if it had not been for more little factors like that, this defendant would be denying to you on the stand, *and counsel would be making the same denial,* that he was ever in the apartment." (Italics his.)

In *State v. Buttry*, 199 Wash. 228, 90 P. (2d) 1026, the prosecuting attorney, in his closing argument, made the following statement:

" 'Ladies and Gentlemen of the Jury, I urge upon you that the death penalty should be inflicted. We have here a man who is vicious, you know he is a killer, there is only one sure way of insuring that he won't be out among decent men and women again, don't leave this thing to the whim of some future governor or parole board. There are men and women who testified here against him, Mr. and Mrs. Davies, Mr. Toler, Paul and Silas Warren, a lot of those people are old acquaintances of his. You have a very serious responsibility for their future well-being. If he walks forth again among men,—he has killed once. That is all I am going to say to you.' "

. In ruling on whether or not the statement complained of constituted prejudicial error, we said:

"It is undoubtedly the right, and, indeed, the duty, of the prosecuting attorney to urge the jury to fix the penalty of death in a case where the evidence strongly tends to show a ruthless and cold-blooded murder. *Lawler v. Commonwealth,* 182 Ky. 185, 206 S. W. 306. And, in arguing the reasons why that penalty should be imposed, he should be given considerable latitude, provided he keeps within the evidence.

" 'While intemperate assertions of opinion not based upon any evidence will never be tolerated, it is none the less in the interest of a sound public policy that prosecuting officers be permitted a reasonable latitude in argumentative deduction from the evidence.' *State v. Peeples,* 71 Wash. 451, 129 Pac. 108, quoted with approval in *State v. Evans, supra.*"

In the instant case, the statements of the deputy prosecuting attorney did not constitute prejudicial error.

We find no reversible errors appearing in the trial, and the judgment and sentence is affirmed.

MALLERY, C. J., MILLARD, SIMPSON, and HILL, JJ., concur.