

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE MAY 1 2 2016

Madsen, C.J.
CHIEF JUSTICE



This opinion was filed for record
at 8:00 am on May 12, 2016

Susan Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| ESTHER KIM, as Personal Representative of the Estate of HO IM BAE on behalf of Mi-Soon Kim, Jae C. Kim, Chang Soon Kim, Jae Hong Kim, and Kyoung Soon Kim, surviving family members; and the ESTATE OF HO IM BAE, | |
| Petitioners/Cross Respondents, | |
| v. | NO. 91536-9 |
| LAKESIDE ADULT FAMILY HOME; GRETCHEN DHALIWAL INCORPORATION (G.D., INC.), a Washington corporation d/b/a LAKESIDE AFH; and GRETCHEN DHALIWAL, individually; and JANE and JOHN DOES I-V, individually, | |
| Defendants, | EN BANC |
| ALPHA NURSING AND SERVICES INCORPORATED, a Washington corporation, | |
| Respondent, | Filed    MAY 1 2 2016 |
| and | |
| CHRISTINE THOMAS, individually, | |
| Respondent/Cross Petitioner. | |

STEPHENS, J.—Ho Im Bae died from acute morphine intoxication at Lakeside Adult Family Home. Esther Kim, the personal representative of Bae's estate, brought tort claims against several individuals involved in Bae's care. This appeal concerns claims against Alpha Nursing & Services Inc. and two of its nurses, who did not provide nursing services to Bae, but who are alleged to have observed signs of abuse and physical assault that should have been reported to the Department of Social and Health Services (DSHS) and law enforcement. The primary issue before us is whether the abuse of vulnerable adults act (AVAA), chapter 74.34 RCW,[1] creates an implied cause of action against mandated reporters who fail to report abuse.

The trial court granted the defendants' motion for summary judgment. The Court of Appeals affirmed, holding that one of the nurses did not have a duty to report and the other nurse fulfilled her reporting duty by contacting DSHS. *Kim v. Lakeside Adult Family Home*, 186 Wn. App. 398, 416, 345 P.3d 850, *review granted*, 183 Wn.2d 1017, 355 P.3d 1152 P.3d 1152 (2015). We reverse the Court of Appeals on this issue. The AVAA creates a private cause of action against mandated reporters who fail to report abuse, and genuine issues of material fact preclude summary judgment.

A separate issue is whether the claims against one of the nurses should be dismissed for insufficient service. The nurse, Christine Thomas, moved to Norway. The plaintiff personally served her there almost a year after filing the amended complaint and properly serving Alpha. The plaintiff also delivered a copy of the

---

[1] This statute has been amended multiple times since the commencement of this action. Except where indicated, these changes do not impact our analysis. For ease of reference, unless otherwise specified, we cite to the current version of the statute.

summons and complaint to Norway's designated central authority pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361 (Hague Convention). The trial court denied Thomas's motion to dismiss, and the Court of Appeals affirmed. *Kim*, 186 Wn. App. at 416. We agree with the Court of Appeals that the statute of limitations was tolled but disagree that *personal* service was proper. Consistent with Norway's ratification of the Hague Convention, however, the plaintiff acted with reasonable diligence in serving Thomas through Norway's designated central authority. We therefore affirm the lower courts' denial of the motion to dismiss.

Both parties seek attorney fees, but we deny their requests as premature because neither party has yet prevailed. We remand this case to the trial court for further proceedings.

## FACTS AND PROCEDURAL HISTORY

This appeal arises out of an order granting summary judgment to defendants Alpha and Thomas, dismissing claims brought by Esther Kim, the personal representative of the estate of Ho Im Bae (collectively Kim). Presented below are the undisputed facts in this case. Additional facts are provided in the analysis section as necessary.

Ho Im Bae, a resident of Lakeside Adult Family Home,[2] died of acute morphine intoxication on March 30, 2009. The state medical examiner ruled the death a

---

[2] Neither Lakeside nor its owner, Gretchen Dhaliwal, are parties to this appeal. *See* Clerk's Papers (CP) at 22-24.

homicide. The autopsy report and a photo in the record reveal visible bruising on Bae's head and neck. The primary suspect, Fanny Irawati,[3] was one of Bae's caregivers and is not a party to this lawsuit.

Alpha is a home health agency that provides nursing services to patients living in adult family homes, assisted living facilities, and private homes. At the time of Bae's death, Alpha employed two nurses who visited patients at Lakeside: Thomas, RN, and Marion Binondo, LPN.[4] Bae was not one of Alpha's patients. Neither Thomas nor Binondo provided her with nursing services.

On March 28 or 29, 2009, Binondo was visiting her patient Kerri Salzbrun at Lakeside. Binondo and Salzbrun heard a "thump" or a "thud" from an adjacent room and went into that room. Binondo saw a woman, now identified as Bae, lying on the floor. Binondo at least suggested to Bae's caregiver, Irawati, that she may want to call 911. Irawati responded that Bae "falls a lot" and that she would call Dhaliwal, Lakeside's owner who is also a nurse. Irawati put Bae back in bed, and Binondo saw that Bae was moving her legs. When Binondo left Lakeside, Irawati was on the phone. Binondo did not call either DSHS or 911 emergency services at that time.

On March 30, 2009, Thomas visited Salzbrun at Lakeside. During that visit, Salzbrun told Thomas that Irawati had been giving Bae morphine. Thomas observed Irawati dragging or pulling Bae into the bathroom. Bae was not moving her feet. Bae

---

[3] This does not appear to be her real name, although it is the name the parties use. *See* CP at 851. Her real name is unknown, so to be consistent with the parties' designation, we refer to her as "Irawati."

[4] Binondo is not a named party to this suit. CP at 925-26.

appeared to Thomas as either "heavily sedated" or at a "decreased level of consciousness." Clerk's Papers (CP) at 767, 179. Thomas looked at Bae's records and determined that Bae was not prescribed morphine. Thomas left the home at approximately 9:55 a.m. and called DSHS at approximately 10:00 a.m. The DSHS hotline number was busy. Thomas called again at approximately 11:30 a.m. and left a message describing her observations and Salzbrun's assertion that Bae was being given morphine.

On April 1, 2009, Thomas and Binondo were working at Alpha's office. Thomas informed Susan Gange, Alpha's director of nursing, that she had called DSHS on March 30 to report her concerns about Bae. At Gange's request, Thomas prepared a written statement for Alpha's files describing what she had told DSHS. That same day, Thomas told Binondo about her observations at Lakeside. Based on that conversation, Binondo believed the woman she heard fall may have been the same woman Thomas observed being dragged into the bathroom. Binondo spoke with Gange about the fall, and Gange instructed Binondo to report the incident to DSHS.

Thomas, a Norwegian citizen who had lived in the United States for over 25 years, moved back to Norway in August 2010. Kim filed her first amended complaint, in which she added Alpha and Thomas as defendants, on March 20, 2012. Kim served Alpha on March 26, 2012. Service on Thomas is at issue and is discussed in detail below.

On April 3, 2013, Thomas moved to dismiss under CR 12(b)(4), (5), and (6), arguing that Kim failed to commence litigation against Thomas within the three-year

statute of limitations period, and that Kim failed to properly serve Thomas under the Hague Convention. Judge Richard T. Okrent denied the motion to dismiss on May 1, 2013. Thomas moved to certify the order denying the motion to dismiss for immediate appellate review. On June 18, 2013, Judge Janice E. Ellis granted the motion for certification.

On March 28, 2013, Alpha and Thomas moved for summary judgment. Judge George F.B. Appel granted their motion on July 16, 2013, and denied Kim's motion for reconsideration on August 2, 2013. Kim appealed the order granting summary judgment, and it was joined with Thomas's cross appeal of the order denying her motion to dismiss. Division One of the Court of Appeals affirmed both decisions. *Kim*, 186 Wn. App. 398. Kim petitioned this court for review, and Thomas cross petitioned for review. We granted both petitions for review. *Kim*, 183 Wn.2d 1017.

## ANALYSIS

The primary issue in this case is whether the mandatory reporting provision of the AVAA, RCW 74.34.035, creates an implied private cause of action for negligent failure to report abuse. "Statutory interpretation is a question of law reviewed do novo." *Beggs v. Dep't of Soc. & Health Servs.*, 171 Wn.2d 69, 75, 247 P.3d 421 (2011). Applying the test this court developed in *Bennett v. Hardy*, 113 Wn.2d 912, 784 P.2d 1258 (1990), we hold that RCW 74.34.035 creates an implied cause of action.

## I.  The AVAA Creates an Implied Cause of Action against Mandated Reporters Who Fail To Report

To determine if a statute creates an implied cause of action, we employ a three-part test. *Bennett*, 113 Wn.2d 912. We ask, "[F]irst, whether the plaintiff is within the class for whose 'especial' benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation." *Id.* at 920-21 (quoting *In re Wash. Pub. Power Supply Sys Sec. Litig.*, 823 F.2d 1349, 1353 (9th Cir. 1987)).

We have previously applied this test to the abuse of children act (ACA), chapter 26.44 RCW, and our analysis in that context guides our analysis here. In *Beggs*, this court held that the mandatory reporting portion of the ACA, RCW 26.44.030, implies a cause of action against mandatory reporters who fail to report suspected child abuse. 171 Wn.2d 69. First, the court found "victims of child abuse are certainly within the class for whose 'special' benefit the legislature enacted the reporting statute." *Id.* at 77. Second, the court found "the statute implicitly supports a civil remedy." *Id.* at 78. The ACA provides immunity from civil liability for those who cooperated in good faith with an investigation arising from a report made under the ACA. *Id.*; RCW 26.44.060(5). The court reasoned, "'A grant of immunity from liability clearly implies that civil liability can exist in the first place.'" *Beggs*, 171 Wn.2d at 78 (quoting *Jane Doe v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 141 Wn. App. 407, 422-23, 167 P.3d 1193 (2007)). Because the statute imposed a duty on certain professionals to report suspected child abuse, we held "[t]he statutory scheme supports

an implied cause of action for a failure to fulfill that duty." *Id.* Finally, the court recognized "an implied cause of action is consistent with the underlying purpose of the statute." *Id.* Looking to the statute's declaration of purpose, we found the purpose of the statute was to ensure that protective services were available to prevent further abuses and safeguard abused children's general welfare. *Id.* Furthermore, legislative history stated, "'Governmental authorities must give the prevention, treatment, and punishment of child abuse the highest priority, and all instances of child abuse must be reported to the proper authorities.'" *Id.* (quoting LAWS OF 1985, ch. 259, § 1).

Subsequent legislative action implicitly approved of this court's holding that the ACA creates an implied cause of action against mandated reporters who fail to report child abuse. The ACA has been amended multiple times post-*Beggs*. Although some of these amendments have limited governmental entities' liability, *see, e.g.*, LAWS OF 2012, ch. 259, § 14, codified at RCW 26.44.280, none of these changes have implicated the implied cause of action this court found in *Beggs*.

The AVAA is similar to the ACA, and thus *Beggs* is persuasive. Indeed, prior to 1999, some of the AVAA's protections were incorporated in the ACA. *See, e.g.*, former RCW 26.44.010-.020 (1969) (incorporating the protection of mentally disabled adults into the statute); former RCW 26.44.010 (1977) (incorporating the protection of adult developmentally disabled persons into the declaration of purpose). Even after the AVAA was enacted, the ACA continued to provide protection for vulnerable adults. *See, e.g.*, LAWS OF 1984, ch. 97, §§ 1, 2 (the same

year that the AVAA was enacted, *see id.* §§ 7-15, 17-18, the legislature amended the ACA, changing "adult developmentally disabled persons" to "adult dependent persons" but maintaining protection for such individuals under chapter 26.44 RCW). It was not until 1999 that the legislature removed all reference to adults from the ACA. *See* LAWS OF 1999, ch. 176, §§ 27-33; *see also* FINAL B. REP. ON SUBSTITUTE H.B. 1620, 56th Leg., Reg. Sess. (Wash. 1999) (explaining that this bill consolidated and made uniform the three statutes that required the reporting and investigation of abuse of vulnerable adults).

Furthermore, the AVAA is similar to the ACA in both structure and purpose. First, vulnerable adults who are the victims of abuse or neglect are within the class of people for whose "special" benefit the legislature enacted the reporting statute. When the legislature consolidated provisions protecting vulnerable adults into chapter 74.34 RCW, it declared, "The purpose of chapter 74.34 RCW is to provide the department [of social and health services] and law enforcement agencies with the authority to investigate complaints of abandonment, abuse, financial exploitation, or neglect of vulnerable adults and to provide protective services and legal remedies to protect these vulnerable adults." LAWS OF 1999, ch. 176, § 1.

Second, legislative intent supports creating a private cause of action against mandated reporters who fail to report. Like the ACA, the AVAA provides immunity for those who in good faith make a report or testify about alleged abuse or neglect under the chapter. *See* RCW 74.34.050. As this court observed in *Beggs*, the provision of immunity from liability implies the possibility of civil liability. *See*

*Beggs*, 171 Wn.2d at 78. Furthermore, the legislature clearly anticipated the possibility of liability for failing to report. In the same provision that grants immunity for those who report in good faith, the legislature limited liability for permissive reporters, providing, "The making of *permissive* reports as allowed in this chapter does not create any duty to report and no civil liability shall attach for any failure to make a *permissive* report as allowed under this chapter." RCW 74.34.050(1) (emphasis added). By specifying that permissive reporters are not liable for failing to report, but remaining silent as to mandated reporters, the legislature implicitly recognized the existence of a cause of action against mandated reporters who fail to report.[5]

---

[5] The legislative history of RCW 74.34.050(1) supports this conclusion. The original AVAA addressed reporting by mandated reporters. *See* former ch. 74.34 RCW (1984). Two years after its enactment, the legislature expanded the list of mandated reporters and added permissive reporting. LAWS OF 1986, ch. 187, § 1. The legislature also amended the civil liability provision to provide immunity from suit for permissive reporters who failed to report. *Id.* § 3(1) ("The making of permissive reports . . . does not create any duty to report and no civil liability shall attach for any failure to make a permissive report . . . ."). Given that the legislature was clearly contemplating both mandated and permissive reporters, we consider its silence with regard to civil liability against mandated reporters a deliberate decision to leave the door open for an action against mandated reporters who fail to report. Similarly, in 1999, the legislature again contemplated both mandated reporters and a limitation on liability against permissive reporters. In the original House Bill 1620, the legislature completely struck permissive reporter's protection from civil liability for failure to report. H.B. 1620, at 6-7, 56th Leg., Reg. Sess. (Wash. 1999). However, in Substitute House Bill 1620, the bill that ultimately became law, the legislature retained the protections for permissive reporters but did not extend such protections to mandated reporters who fail to report. *See* LAWS OF 1999, ch. 176, § 6. At the time, the legislature was clearly contemplating the roles of both mandated and permissive reporters in the AVAA. It added new definitions for mandated and permissive reporters, repealed the AVAA's old reporting provision, and added new reporting requirements for both mandated and permissive reporters. *See id.* §§ 3 (adding definitions), 35 (repealing the AVAA's original reporting provision, RCW 74.34.030), 5

Finally, recognizing an implied cause of action is consistent with the purpose of the statute. The purpose of the AVAA is to give DSHS and law enforcement authority to investigate alleged abuse and neglect of vulnerable adults, and to provide those adults with protective services and legal remedies. LAWS OF 1999, ch. 176, § 1. Implying a cause of action for failing to report suspected abuse or neglect is consistent with the legislature's intent to ensure that DSHS and law enforcement investigate cases of suspected abuse, and are able to provide protective services to abused vulnerable adults.

One notable difference between the ACA and the AVAA is that "[i]n addition to other remedies available under the law," the AVAA explicitly includes a cause of action for vulnerable adults who have suffered abuse or neglect either while residing in a facility, or, for those residing at home, "who receive[] care from a home health, hospice, or home care agency, or an individual provider." RCW 74.34.200(1). The ACA does not explicitly create any similar cause of action.

This AVAA provision does not preclude also finding an implied cause of action against mandated reporters for failure to report. The express liability provision provides redress for *actual abuse*; it does not provide redress for those who breach their mandatory reporting duty. "Courts have consistently held that when a statute gives a new right and no specific remedy, the common law will

---

(creating the new reporting requirements for mandated and permissive reporters). Again, the legislature's silence with regard to civil causes of action against mandated reporters implies legislative acquiescence to a civil action against mandated reporters who fail to report abuse.

provide a remedy." *State ex rel. Phillips v. Wash. State Liquor Control Bd.*, 59 Wn.2d 565, 570, 369 P.2d 844 (1962). The AVAA creates a right to have suspected abuse reported without providing a remedy for a violation of that right. Implying a cause of action for a mandated reporter's failure to report suspected abuse or neglect is thus appropriate.[6]

## II. Summary Judgment Was Improper as to the AVAA Claims

A court may grant summary judgment when, on the basis of the facts before it, a reasonable fact finder could reach only one conclusion. *See SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 140, 331 P.3d 40 (2014). This court reviews orders for summary judgment de novo. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). An appellate court considers all of the evidence presented to the trial court and "engages in the same inquiry as the trial court." *Id.* Summary judgment is appropriate only "when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* The moving party bears the burden of demonstrating there is no issue of material fact, and all facts and reasonable inferences therefrom must be viewed

---

[6] Nor is it significant that the AVAA provides a mandated reporter "who knowingly fails" to report is guilty of a gross misdemeanor. RCW 74.34.053(1). The same criminal penalty is present in the ACA for failing to report. *See* RCW 26.44.080. Furthermore, the imposition of criminal penalties does not preclude finding an implied cause of action. *See Wingert v. Yellow Freight Sys., Inc.*, 146 Wn.2d 841, 850, 50 P.3d 256 (2002) (noting "our courts have implied a private right of action against an employer who violates RCW 49.48.010 (unlawful to withhold or divert an employee's wages) even though violation of the statute also constitutes a misdemeanor").

in the light most favorable to the nonmoving party. *See SentinelC3*, 181 Wn.2d at 140; *Folsom*, 135 Wn.2d at 663.

In this case, there are genuine disputes of material fact that preclude granting summary judgment. As employees of Alpha, Thomas and Binondo are mandated reporters under the AVAA. *See* RCW 74.34.020(13) (defining "mandated reporter" to include "an employee of a . . . home health . . . agency"); CP at 447. Although the parties agree on this point,[7] the defendants argue that Binondo had no duty under the AVAA to report suspected abuse because she did not observe signs of abuse. Suppl. Br. of Resp't/Cross-Pet'r at 14-15. They further argue that Thomas had no duty to report to law enforcement, and that reporting to DSHS fulfilled her requirements under the AVAA. *Id.* The defendants also contend that Kim failed to present any admissible evidence to show Binondo or Thomas had reason to believe abuse was occurring. *Id.* at 15.[8]

Under the AVAA, mandated reporters have a duty to report suspected abuse or neglect to DSHS and, in appropriate circumstances, directly to law enforcement. The statute provides:

> (1) When there is reasonable cause to believe that abandonment, abuse, financial exploitation, or neglect of a vulnerable adult has occurred,

---

[7] Although originally Alpha and Thomas argued that neither Thomas nor Binondo had a duty to report suspected abuse of Bae because Bae was not their patient, CP at 901-03, they no longer advance this argument. *See* Suppl. Br. of Resp't/Cross-Pet'r at 14-15.

[8] We need not address the issue of harm. It is undisputed that Bae died because of acute morphine intoxication. We also need not address causation, which was raised in Alpha and Thomas's motion for summary judgment but was not addressed in the Court of Appeals opinion and is not asserted by Alpha and Thomas as a basis to affirm the summary judgment order.

> *mandated reporters shall immediately report* to the department [of social and health services].
>
> . . . .
>
> (3)  When there is reason to suspect that physical assault has occurred or there is reasonable cause to believe that an act has caused fear of imminent harm:
>
> (a)  *Mandated reporters shall immediately report* to the department; and
>
> (b)  *Mandated reporters shall immediately report* to the appropriate law enforcement agency, except as provided in subsection (4) of this section.[9]

RCW 74.34.035 (emphasis added).  Whether an individual has a duty in the first instance is a question of law.  *Folsom*, 135 Wn.2d at 671.  As discussed above, the statute creates an implied cause of action, and its plain language requires mandated reporters to report suspected abuse to either DSHS, or DSHS and law enforcement.

The Court of Appeals did not directly address the duty question, instead holding Thomas and Binondo acted reasonably.  *Kim*, 186 Wn. App. at 409-15, 415 n.10.  Kim is correct that whether an individual has "reasonable cause" or "reason to suspect" abuse goes to the question of breach, not duty.  The Court of Appeals appears to have conflated these issues.  *See Kim*, 186 Wn. App. at 409-15.  Alpha and Thomas adopt this faulty reasoning, arguing that Binondo had no duty to report to DSHS and Thomas had no duty to report to law enforcement because they acted reasonably, consistent with the statute.  Suppl. Br. of Resp't/Cross-Pet'r at 14-15.

We agree with Kim that the court must separate the questions, first identifying the duty the statute unequivocally places on mandated reporters, and then

---

[9] Subsection (4) addresses the reporting of incidents of physical assault between vulnerable adults.  RCW 74.34.035(4).

considering if genuine issues of material fact exist as to whether the reports of abuse Binondo and Thomas received were credible, and whether they acted appropriately.

We have already identified the relevant legal duty under the AVAA. The issue of breach is quintessentially a question for the trier of fact; it cannot be resolved on summary judgment unless the material facts are undisputed and reasonable minds could not disagree on the question. *See Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). In this case, there are genuine issues of material fact as to whether (1) Binondo had "reasonable cause to believe" that abuse was occurring and (2) Thomas had "reason to suspect that physical assault had occurred" such that she should have reported directly to law enforcement and DSHS.

The terms "reasonable cause to believe" and "reason to suspect" have not been defined in the AVAA, and there appears to be no case law interpreting them.[10] In similar contexts, however, whether an individual has "reasonable cause to believe" or "reason to suspect" are questions for the jury. *Cf. State v. Baker*, 30 Wn.2d 601, 606-07, 192 P.2d 839 (1948) ("The question whether the resistance of the complaining witness was prevented by fear of immediate and great bodily harm which she had reasonable cause to believe would be inflicted upon her, was a question of fact to be determined by the jury.").

The AVAA defined "abuse" as "the willful action or inaction that inflicts injury, unreasonable confinement, intimidation, or punishment on a vulnerable

---

[10] The ACA, which as noted above is similar to the AVAA, defines "reasonable cause" as "a person witnesses or receives a credible written or oral report alleging abuse, including . . . neglect of a child." RCW 26.44.030(1)(b)(iii).

adult. . . . Abuse includes . . . physical abuse." Former RCW 74.34.020(2) (2008). "Physical abuse" is "the willful action of inflicting bodily injury or physical mistreatment. Physical abuse includes, but is not limited to, . . . the use of chemical restraints." Former RCW 74.34.020(2)(b) (2008). Giving a patient morphine without a prescription would qualify as physical abuse by use of a chemical restraint. In addition, it may qualify as assault under chapter 9A.36 RCW, which defines "assault" to include the administration of a "destructive or noxious substance." RCW 9A.36.011(1)(b), 9A.36.021(1)(d).

Alpha and Thomas argue there is no admissible evidence to support a finding that Binondo had reasonable cause to believe Bae was being abused. Suppl. Br. of Resp't/Cross-Pet'r at 15. This argument overlooks the following evidence creating a genuine dispute of material fact: in her call to DSHS, Binondo told DSHS that she noted Bae "had passed out" after the fall. CP at 309-10.[11] Binondo witnessed Irawati pick Bae up after the fall (something Binondo cautioned Irawati against), drag her into bed, and then not examine Bae. *Id.* Binondo also told DSHS that Salzbrun told her "she thought [Bae] looked doped as she saw [Irawati] crush pills. . . . I know what they look like because I take them also." *Id.* at 310. Binondo also indicated that not only did she think Salzbrun was reliable, but that Salzbrun had told her the same thing multiple times. *Id.* (when asked if Salzbrun was reliable, Binondo

---

[11] Despite Alpha and Thomas's arguments, *see* CP at 71-72, the notes from DSHS on Thomas's and Binondo's calls may be admissible under the Uniform Business Records as Evidence Act, chapter 5.45 RCW. *See* RCW 5.45.020. The record contains the DSHS custodian's verification. CP at 314.

responded, "I think so. . . . Now I think she is pretty reliable. She keeps telling me the same thing over and over. I think she is pretty reliable about it."). Looking at this evidence, a jury could conclude that on the day she heard Bae fall, Binondo had "reasonable cause to believe" Bae was being abused, thus triggering Binondo's duty as a mandated reporter to immediately report the suspected abuse to DSHS. *See* RCW 74.34.035(1).

There is additional evidence that could support a jury's conclusion that Binondo had reasonable cause to believe Bae was being abused or neglected on the day of the fall. Salzbrun also stated that she told Binondo Bae was "doped up" shortly before Binondo left on the day of the fall. CP at 124. In addition, in her deposition, Binondo stated she "[p]robably" remembered Bae losing consciousness after the fall, *id.* at 332, and despite knowing the dangers of head strikes after a fall, *see id.* at 331, Binondo did not insist Bae's caregiver call 911 nor call 911 herself. *Id.* at 329. All of this evidence raises questions of material fact that preclude summary judgment.

Alpha and Thomas also argue that there is no admissible evidence to support a finding that Thomas had "reason to suspect" that Bae was being abused such that it would require an immediate call to law enforcement in addition to DSHS. The Court of Appeals agreed and held that because Thomas did not actually see Bae being given morphine and because she doubted Salzbrun's credibility, there was insufficient evidence of physical assault to require Thomas to call law enforcement in addition to DSHS. *See Kim*, 186 Wn. App. at 413-15.

The Court of Appeals erred in making a credibility determination. "[C]redibility determinations are solely for the trier of fact." *Morse v. Antonellis,* 149 Wn.2d 572, 574, 70 P.3d 125 (2003). There is sufficient admissible evidence to raise a question of material fact as to whether Thomas had "reason to suspect" that Bae was being abused, such that she was required to report directly to law enforcement. The day of Bae's death, Thomas reported to DSHS that Salzbrun told her she had seen morphine next to Bae's bed, and that Bae had been sedated to the point where she was unable to eat. Thomas told DSHS that Bae did not have an order for morphine and that Thomas had observed Bae, the patient Salzbrun told her was being overmedicated, appearing lethargic and being dragged to the bathroom. Thomas later told DSHS that Salzbrun would recognize morphine, and that although she was not 100 percent sure if Salzbrun was reliable, "something seemed fishy. [Salzbrun] would know what she saw." *Id.* at 307. Based on her reports to DSHS, a jury could easily conclude that Thomas had "reason to suspect" Bae suffered a physical assault, thus triggering Thomas's duty to immediately call law enforcement and DSHS. *See* RCW 74.34.035(3).

Thomas reiterated much of this information in both her declaration and deposition testimony. Thomas stated that one of her patients told her Bae was being given morphine. CP at 767. Salzbrun also testified she told Thomas Bae "had been given someone else's morphine and was doped up." *Id.* at 124. While at Lakeside, Thomas observed "[Irawati] dragging a small Korean woman to the bathroom. [Thomas] did not see the Korean woman moving her feet. She appeared to [Thomas]

to be heavily sedated." *Id.* at 767. Thomas was "a little alarmed" at the situation. *Id.* at 173. Thomas agreed that on March 30, 2009, when she left Lakeside, she was leaving Bae "in the hands of the woman who [she was] told was giving her morphine." *Id.* at 182. This testimony raises sufficient questions of material fact to defeat summary judgment.

Kim also raises a genuine question of material fact as to whether either Binondo or Thomas "immediately" reported to DSHS or law enforcement. *Id.* at 149-51. Whether an individual acts "immediately" is a question for the jury. *See State v. Sherman*, 98 Wn.2d 53, 57, 653 P.2d 612 (1982) (holding that in the context of the felony flight statute, "'immediately' means stopping as soon as reasonably possible once signaled by a police officer to halt," and that given the facts of the case, "the trier of fact could well have found he did not meet the requirements of 'immediately'").

In this case, it is undisputed that Binondo did not call DSHS until after Bae's death, and that neither she nor Thomas ever called law enforcement. Nothing prevented Thomas from calling law enforcement. CP at 182. Thomas called DSHS at approximately 10:00 a.m., five minutes after leaving Lakeside. She got a busy signal and called back approximately an hour and a half later, at 11:30 a.m. Whether this constitutes calling "immediately" is a question for the jury.

Kim has presented sufficient evidence to defeat summary judgment. There are existing questions of material fact as to whether Binondo and Thomas reasonably believed or suspected that abuse was occurring, such that they had to report to either

DSHS or to DSHS and law enforcement, and whether Thomas reported to DSHS immediately. Summary judgment was improper.

*III. Service of Process on a Defendant in Norway Must Comply with the Hague Convention. Personal Service by an Independent Process Server Does Not Comply with the Convention as Service Must Be Effectuated through Norway's Designated Central Authority*

Service of process on a defendant in Norway falls under the purview of the Hague Convention. Thomas and Kim appear to agree on this point. Thomas was personally served with process at her home in Nannestad, Norway. CP at 793-97. This service was not effectuated through the Norwegian government. *Id.* at 744-45. Thomas argues this personal service was improper because it was not completed in accordance with the Hague Convention. *See, e.g., id.* 803-04; Br. of Resp'ts/Cross-Appellants at 32-33; Suppl. Br. of Resp'ts/Cross-Pet'r at 4-7. Thomas also argues that serving documents written only in English violates Norway's translation requirements. *See, e.g.*, Suppl. Br. of Resp'ts/Cross-Pet'r at 9-10. In the courts below, Kim asserted that personal service was proper under Hague Convention articles 5 and 19, and under Norwegian law. *See, e.g.*, Reply/Cross-Resp. Br. of Appellants at 18-19. Kim now argues "the Hague Convention issue is moot because Kim also served Thomas through the Norwegian Central Authority." Suppl. Br. of Pet'r at 12.

The Court of Appeals held, "Because Norway has not objected to personal service and, in fact, such service complied with its laws, there is no reason to invalidate service in this case." *Kim*, 186 Wn. App. at 406. The Court of Appeals, like Kim, relied on articles 5(a) and 19 of the Hague Convention, and on Norwegian law. *Id.* at 405-06.

The court also noted that personal service was proper under Washington's rules of civil procedure, specifically CR 4(i)(1). *Id.* at 407.

"This court reviews de novo if service of process was proper." *Scanlan v. Townsend,* 181 Wn.2d 838, 847, 336 P.3d 1155 (2014). Although Kim asserts that this issue is moot, the record before us indicates service is still pending in Norway. *See* CP at 558. Moreover, this court may review a moot issue if it is one "of continuing and substantial public interest." *In re Marriage of Horner,* 151 Wn.2d 884, 891, 93 P.3d 124 (2004). Ensuring proper service of process is such an issue. This case addresses matters that are public in nature and for which an authoritative determination is desirable. Furthermore, this is at least the second case this court has seen addressing service under the Hague Convention. *See Broad v. Mannesmann Anlagenbau, AG,* 141 Wn.2d 670, 10 P.3d 371 (2000) (addressing tolling of the statute of limitations for international service of process in accordance with the Hague Convention). This indicates that issues of international service of process are likely to recur. We therefore choose to address this issue and provide guidance, regardless of mootness.

The Hague Convention is a multilateral treaty "intended to provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad." *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 698, 108 S. Ct. 2104, 100 L. Ed. 2d 722 (1988). It applies in all civil cases "where there is occasion to transmit a judicial or extrajudicial document for service abroad" where the address of the person to be served is known. Hague Convention, 20 U.S.T. at 362; *see also Broad,* 141 Wn.2d

at 675. "[C]ompliance with the Convention is mandatory in all cases to which it applies," and the provisions of the Hague Convention preempt inconsistent methods of service prescribed by state law. *Schlunk*, 486 U.S. at 705; *see Broad*, 141 Wn.2d at 674-75.

The Hague Convention requires each state to designate a central authority, which receives requests for service, and either serves the documents itself or arranges service. Hague Convention, 20 U.S.T. at 362-63. The Hague Convention also establishes alternative methods of service. *See id.* at 363.[12] Where a state objects to these alternative methods, plaintiffs must use the designated central authority to execute service. *See Broad*, 141 Wn.2d at 674 ("Germany has objected [to the alternative methods of service in articles 8 and 10], and requires that plaintiffs who sue defendants in Germany must request that the designated central authority execute service of process.").

Both the United States and Norway are signatories to the Hague Convention. *See Status Table*, Hague Conference on Private Int'l Law (last visited Apr. 26, 2016), http://www.hcch.net/index_en.php?act=conventions.status&cid=17. Norway has objected to the alternative methods of service, and thus service on defendants in Norway must be through the Royal Ministry of Justice and Public Security, Department of Civil

---

[12] Articles 8 and 9 allow service through diplomatic or consular agents or channels. Article 10 allows service through postal channels, by "judicial officers, officials or other competent persons of the State of origin . . . directly through the judicial officers, officials or other competent persons of the State of destination," and by "any person interested in a judicial proceeding . . . directly through the judicial officers, officials or other competent persons of the State of destination." Hague Convention, 20 U.S.T. at 362. States may object to the methods in articles 8 and 10.

Affairs, the designated central authority. *See id.*; *Details*, Hague Conference on Private Int'l Law (last visited Apr. 26, 2016), http://www.hcch.net/en/states/authorities/details3/&aid=246; *cf. Broad*, 141 Wn.2d at 674.

Kim and the Court of Appeals erroneously relied on articles 5 and 19 of the Hague Convention to establish personal service was proper. "When interpreting a treaty, we 'begin with the text of the treaty and the context in which the written words are used.'" *Schlunk*, 486 U.S. at 699-700 (internal quotation marks omitted) (quoting *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court*, 482 U.S. 522, 534, 107 S. Ct. 2542, 96 L. Ed. 2d 461 (1987)). Article 5 of the Hague Convention provides in relevant part:

> The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either
>
> (a)  by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or
> (b)  by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed.
> Subject to sub-paragraph (b) of the first paragraph of this Article, the document may always be served by delivery to an addressee who accepts it voluntarily.
> If the document is to be served under the first paragraph above, the Central Authority may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed.

Hague Convention, 20 U.S.T. at 362.

This article's structure is clear: the options for service in subsections (a) and (b) are available only if the central authority either serves the documents itself or arranges for their service. *See Schlunk*, 486 U.S. at 699 ("Once *a central authority*

receives a request in the proper form, *it* must serve the documents by a method prescribed by the internal law of the receiving state or by a method designated by the requester and compatible with that law." (emphasis added)). The same is true for direct, voluntarily accepted service, which is permissible only if service has been accomplished through the central authority. Paragraph two does not create a separate method of service outside of the central authority.[13]

Similarly, the Hague Convention does not convert a country's domestic laws on service of process into laws governing service of process of documents coming from abroad. Article 19 states, "To the extent that the internal law of a contracting State permits methods of transmission, other than those provided for in the preceding articles, *of documents coming from abroad,* for service within its territory, the present Convention shall not affect such provisions." Hague Convention, 20 U.S.T. at 365 (emphasis added). This provision refers only to a country's laws that specifically deal with service of process of documents coming from abroad. It does not pertain to the general service of process laws that apply to wholly domestic actions. *See Shenouda v. Mehanna,* 203 F.R.D. 166, 171 (D.N.J. 2001) ("Article 19 provides that the internal law of a signatory with respect to service from abroad within its territory is not affected by the Convention."). There are apparently no

---

[13] The Hague Convention "provides for *one main channel* of transmission and *several alternative channels* of transmission." HAGUE CONF. ON PRIVATE INT'L LAW, HAGUE CONVENTION OF 15 NOVEMBER 1965 ON THE SERVICE ABROAD OF JUDICIAL AND EXTRAJUDICIAL DOCUMENTS IN CIVIL OR COMMERCIAL MATTERS 1, charts 1-2 (2009), https://assets.hcch.net/upload/outline14e.pdg. The main channel—service by the central authority—is outlined in article 5. The additional channels, as explained above, are found in articles 8, 9, and 10. *Id.*

Norwegian laws that govern service of process of documents from abroad; thus, service of such documents must conform with the methods outlined (and not objected to) in the Hague Convention. Because Norway has objected to alternative methods of service, service must be accomplished by or through the Royal Ministry.

Kim's attempt to serve Thomas by direct personal service was improper because it did not comply with the Hague Convention. However, because Kim is also serving Thomas through the Royal Ministry, *see* CP at 558, 631-33, service will be proper once the Royal Ministry completes it. As addressed below, the statute of limitations has tolled. Contrary to Thomas's argument, the fact that the documents were written only in English is of no consequence. Although Norway generally requires documents to be written in Norwegian, Danish, or Swedish, "the Ministry of Justice may . . . permit the service of [untranslated] documents if it is convinced that the addressee understands the language used in the document." *Details, supra.* In this case, the documents did not need to be translated from English. Matora Yoga, executive officer of the Royal Ministry, informed Kim that "[d]ue to that the addressee understands the language, it is sufficient to enclose the English language document." CP at 633.[14] Thus, the documents may be served in English.

---

[14] Yoga appeared to believe that Thomas was an American citizen whose primary language is English. CP at 633. Thomas is not, in fact, an American citizen. *Id.* at 169. However, there is ample evidence that she speaks English fluently: she lived and worked in the United States for over 25 years, completed high school in the United States, obtained an associate degree in nursing in the United States, and passed her boards to become a registered nurse in the United States. *Id.* at 168-69.

We reverse the Court of Appeals' decision insofar as it held that personal service without going through the central authority is proper in Norway. However, we affirm the Court of Appeals' conclusion that service on Thomas will be proper once the central authority completes it.

## IV. *The Statute of Limitations Was Tolled as to Thomas*

Independent of the insufficient service issue, Thomas argues she was not timely served. *See* Br. of Resp'ts/Cross-Appellants at 34; Suppl. Br. of Resp't/Cross-Pet'r at 12-13. Thomas admits that under *Sidis v. Brodie/Dohrmann, Inc.,* 117 Wn.2d 325, 815 P.2d 781 (1991), proper and timely service on one defendant tolls the statute of limitations as to any other defendant. Suppl. Br. of Resp't/Cross-Pet'r at 11-13. However, Thomas argues that the circumstances presented in this case go beyond the permitted tolling because Kim was not sufficiently diligent in attempting service on Thomas. *See id.* Kim argues that she has timely proceeded with her case; that there is no due diligence requirement under *Sidis*; and that even if there was, she has met it, and any delay in service was due to Thomas fleeing to Norway and her attorney's deception as to Thomas's whereabouts. Suppl. Br. of Pet'r at 14-16.

In *Sidis*, this court held that under RCW 4.16.170 (the tolling statute),[15] timely service of one defendant tolls the statute of limitations for serving other defendants in

---

[15] RCW 4.16.170 states in relevant part:
For the purpose of tolling any statute of limitations an action shall be deemed commenced when the complaint is filed or summons is served whichever occurs first. If service has not been had on the defendant prior to the filing of the complaint, the plaintiff shall cause one or more of the defendants to be served personally, or commence service by publication within ninety days from the date of filing the complaint. . . . If . . . following filing, service is

-26-

multidefendant actions. 117 Wn.2d 325. The court was careful to note that although the statute literally "tolls the statute of limitation for an *unspecified* period, that period is not *infinite*." *Id.* at 329. "Plaintiffs must proceed with their cases in a timely manner as required by court rules, and must serve each defendant in order to proceed with the action against that defendant." *Id.* The court reasoned, "It is arguably unfair to require a plaintiff to serve all defendants within a set limitation period, when it may be difficult or impossible to determine the actual location of some defendants before discovery is underway." *Id.* at 330.

In *Bosteder v. City of Renton*, this court held that serving a defendant 8 months after filing the complaint (and 11 months after serving a codefendant) did not violate *Sidis* because other defendants were timely and properly served, and because the late-served defendant "failed to demonstrate how she was prejudiced by any delay in service, or how a court rule was violated." 155 Wn.2d 18, 49, 117 P.3d 316 (2005). In that case, the plaintiff did not provide any rationale for his delay. *Id.* However, while noting that "there is little guidance for determining whether the eight-month delay was excessive," the court considered various facts in the record and found evidence of what could have led to the delayed service. *Id.*

This court most recently examined *Sidis*'s contours in *Powers v. W.B. Mobile Services, Inc.*, 182 Wn.2d 159, 339 P.3d 173 (2014). In that case, Powers filed a personal injury suit in 2009 naming (among other parties) John Doe One as the "'builder

---

not so made, the action shall be deemed to not have been commenced for purposes of tolling the statute of limitations.

of the handicap access ramp where the incident occurred.'" *Id.* at 162. Powers timely served the two named defendants but did not serve John Doe One. *Id.* Over a year and a half after serving the named defendants, Powers moved to amend his pleading to replace John Doe One with W.B. Mobile. *Id.* at 163. W.B. Mobile moved to dismiss "for failure to bring claims within the statute of limitations." *Id.* This court was asked "whether service of process on one defendant tolls the statute of limitations as to an unserved and unnamed defendant that the plaintiff identified with a placeholder such as 'John Doe.'" *Id.* at 161.

Relying on *Sidis*, the court held, "[S]ervice of process on one defendant tolls the statute of limitations as to an unserved and unnamed defendant if the plaintiff identifies the unnamed defendant with reasonable particularity." *Id.* "In *Sidis*, this court observed 'that in some cases, if identified with reasonable particularity, "John Doe" defendants may be appropriately "named" for purposes of RCW 4.16.170.'" *Id.* at 164 (quoting *Sidis*, 117 Wn.2d at 331). The court explained a defendant is identified with reasonable particularly if the plaintiff can establish,

> from the commencement of the statute of limitations, the plaintiff made a *diligent effort* to identify the actual defendant given the information reasonably available . . . and . . . the plaintiff provided information about the unnamed defendant in the complaint to the greatest extent possible . . . and . . . the defendant had or should have received such notice of the action that it will not be prejudiced in maintaining a defense on the merits . . . .

*Id.* at 164-65 (emphasis added). The court analyzed the specific facts of the case and determined that Powers reasonably identified the defendant because he made a diligent effort to identify and name W.B. Mobile. *Id.* at 166. Furthermore, W.B. Mobile was

-28-

unable to show prejudice because its owner and sole employee received a copy of the complaint—actual notice—within 90 days after service. *Id.* at 167.

Relying on *Powers* and RCW 4.16.170, the Court of Appeals held that timely service on Alpha, the codefendant, tolled the statute of limitations for Thomas. *Kim,* 186 Wn. App. at 405. We agree and find that Kim acted diligently to serve Thomas. To review the relevant facts: after living in the United States for over 25 years, Thomas moved back to Norway in August 2010. CP at 168-69. Kim amended her complaint on March 20, 2012, naming Thomas and Alpha as defendants. *Id.* at 933. Alpha was served with the first amended complaint on March 26, 2012. *See id.* at 799. The parties do not dispute that Alpha was timely and properly served. The three-year statute of limitations ran on March 30, 2012. Defense counsel entered a notice of appearance on behalf of both Alpha and Thomas on April 4, 2012. *Id.* at 1281-82. On April 20, 2012, Alpha and Thomas filed an answer to the amended complaint. *Id.* at 909-14. In their answer, Alpha and Thomas asserted that Thomas had not been served, however, they did not indicate that Thomas was living in Norway. *Id.* at 913. On September 25, 2012, Kim sent Alpha her first set of interrogatories and requests for production, seeking among other things contact information for all former and current Alpha employees who treated Alpha patients at Lakeside. *Id.* at 487-502 (with answers). On October 25, 2012, Alpha provided Thomas's address as "c/o Cozen O'Connor," with the law firm's street address. *Id.* at 490, 502. On November 26, 2012, Alpha's attorneys sent an e-mail response to Kim's counsel regarding a notice of deposition, indicated that Thomas lived in Norway (without providing an address), and blind-copied Thomas. *Id.* at 1184-

86. On December 3, 2012, Kim's attorney demanded Thomas's address and noted that it was clear from the blind copy that Alpha could easily obtain Thomas's address. *Id.* at 609. On December 11, 2012, Alpha provided Thomas's address in Norway in its first supplemental response to Kim's first set of interrogatories. *Id.* at 1192, 1195.

On March 21, 2013, almost a year after Alpha was served, Thomas accepted personal service of process. *Id.* at 1203-04. That same day, Curtis Williams (a paralegal from Graham Lundberg Peschel PS, Kim's attorneys) e-mailed the Royal Ministry to inquire about forwarding documents to the ministry for service under the Hague Convention. *See id.* at 633. The Norwegian official, Matora Yoga, responded on March 26, 2013, *id.* at 633, and on April 3, 2013, Williams sent an e-mail indicating that FedEx International MailService had delivered the documents to the Royal Ministry that day. *Id.* at 632. Yoga responded on April 9, 2013, indicating that they had not yet received the documents but that as soon as they did, they would begin the appropriate process for service. *Id.* at 631. Williams followed up with the Royal Ministry on June 3, 2013, and Yoga responded on June 11, 2013, that the "case is still pending. We will forward the answer to you as soon as we receive this." *Id.* at 558.

This record demonstrates that Kim acted diligently to learn Thomas's whereabouts and to serve her. As this court noted in *Bosteder* and *Sidis*, in multidefendant litigation it may be difficult for the plaintiff to locate some defendants before discovery. *Bosteder*, 155 Wn.2d at 48; *Sidis*, 117 Wn.2d at 330. Here, Kim was not able to obtain Thomas's address until December 11, 2012, despite the fact that Kim's attorneys had requested the address multiple times and Thomas's attorneys could

have easily discovered her address. A three-month delay between obtaining the address and attempting service (both personal, which Kim thought was proper, and through the Royal Ministry) is excusable given the delay in obtaining Thomas's address and the necessity of arranging for service of process in Norway.

This conclusion is supported by the fact that in *Broad*, this court held "[b]ecause the plaintiff lacks control over the timing of service once the documents are transmitted to a designated central authority," the 90-day period of RCW 4.16.170 is tolled once the documents are transmitted to the central authority. 141 Wn.2d at 683. Although the *Broad* court specified that the documents had to be transmitted to the central authority within the 90-day period, that case dealt with a single defendant. *See id.* at 673. Here, because tolling was proper under *Sidis*, there was no need for the defendants to transmit the documents to the central authority within 90 days. Now that the documents have been transmitted, the statute of limitations is tolled until the Royal Ministry completes service.

In addition, Thomas has not shown prejudice. She argues that she was prejudiced because the statute of limitations had run and she was therefore entitled to dismissal of the claims against her. *See* Resp'ts/Cross-Appellants Reply Br. at 16. This argument incorrectly presupposes the statute of limitations was not tolled. Furthermore, Thomas either constructively or actually had notice of the suit when her attorneys—who are also Alpha's attorneys—received a copy of the complaint on March 26, 2012.

There is no doubt that "each defendant must still be served, and thus given actual notice, before any action can be taken concerning it." *Sidis*, 117 Wn.2d at 331. In this

case, service on Alpha was timely and properly completed, thus tolling the statute of limitations as to Thomas. Once effectuated by the Royal Ministry, Thomas will have been timely and properly served, and the action may proceed against her.

*V. Neither Party Is Entitled to Attorney Fees at This Point*

Thomas argues she is entitled to attorney fees and costs under RCW 4.28.185(5), Washington's long arm statute. Br. of Resp'ts/Cross-Appellants at 36. Neither Kim nor the Court of Appeals addressed Thomas's claim to attorney fees.

Washington's long arm statute provides in relevant part:

> In the event the defendant is personally served outside the state on causes of action enumerated in this section, and prevails in the action, there may be taxed and allowed to the defendant as part of the costs of defending the action a reasonable amount to be fixed by the court as attorneys' fees.

RCW 4.28.185(5). While Kim attempted service under RCW 4.28.185, *see* CP at 1246-48, Thomas has not yet "prevailed in the action." Thomas is therefore not entitled to attorney fees at this point. *See generally Scott Fetzer Co. v. Weeks*, 114 Wn.2d 109, 786 P.2d 265 (1990) (discussing RCW 4.28.185(5)'s "prevailing party").

Separately, Kim argues that assuming she prevails at trial, she is entitled to an award of attorney fees both at trial and on appeal pursuant to RCW 74.34.200. Br. of Appellants at 31. Because Kim has not yet prevailed at trial, her claim to fees is also premature.

CONCLUSION

We reverse in part the Court of Appeals' decision. The AVAA creates an implied cause of action against mandated reporters who fail to report suspected abuse

or neglect. There are genuine issues of material fact that must be resolved by a trier of fact, making summary judgment dismissal of these claims inappropriate.

We affirm the Court of Appeals insofar as it held that Kim's proper and timely service on Alpha tolled the statute of limitations as to Thomas. While the Court of Appeals was incorrect in holding that *personal* service was proper, Kim correctly served Thomas through Norway's Royal Ministry in accordance with the Hague Convention. The statute of limitations was tolled at the time service was made.

Reversing in part and affirming in part, we remand this case to the trial court for further proceedings.

Stephens, J.

WE CONCUR:

Madsen, C.J.

Wiggins, J.

Johnson, J.

González, J.

Owens, J.

Gordon McCloud, J.

Fairhurst, J.

Yu, J.