IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DIANE PERILLO and TED PERILLO, Trustees of the Diane Perillo Living Trust, dated September 28, 2011, | ) ) ) ) | No. 80055-8-I |
| Petitioners, | ) ) ) | DIVISION ONE |
| v. | ) ) | |
| ISLAND COUNTY, a political subdivision of the State of Washington, | ) ) ) | PUBLISHED OPINION |
| Respondent, | ) ) ) | |
| VIEW SUN INVESTMENTS, LLC, a limited liability company, | ) ) ) | |
| Defendant. | ) ) | |

BOWMAN, J. — Diane and Ted Perillo bought a home on Camano Island. As they prepared to move into their new home, neighbors informed them it had a long history as a "drug house." Testing revealed levels of methamphetamine contamination so high that the house was not habitable and needed to be demolished. The Perillos learned that the Island County Sheriff's Office and Island County Public Health were aware of drug activity at the home for years. The Perillos filed a negligence claim against Island County for failure to inspect the property for hazardous chemical contamination as required under RCW 64.44.020. The Perillos appeal the trial court's determination that the public duty doctrine barred their claim and the order granting summary judgment for Island

County.  We conclude that the legislative intent exception to the public duty doctrine applies to the Perillos' negligence claim and that sufficient evidence of a legal duty precludes summary judgment.  We reverse and remand.

FACTS

The house at 505 Michelle Drive on Camano Island sat derelict for many years after its owner went to prison in 2010.  The house became a hub of criminal activity, illegal drug use, and garbage dumping.  In May 2015, title to the property transferred back to the lender bank.  Later that year, a real estate preservation and maintenance company began efforts to restore the property, hiring successive contractors for the massive undertaking to clean the property.  In 2016, the lender sold the restored property to View Sun Investments LLC, who listed the property for sale.

On February 24, 2017, Diane and Ted Perillo bought the newly renovated house for $479,000.  As they prepared to move in, service providers and neighbors warned them of the property's dubious history.  Both the Frontier phone and Internet installer and the DISH Network installer were familiar with the property and told the Perillos the house was "well known on the island as a drug house."  Through conversations with neighbors, the Perillos learned of extensive law enforcement activity on the property and of multiple complaints to law enforcement and the local health department about the property.

The Perillos' real estate agent contacted Island County Public Health (ICPH) and filed a public records request for "[a]ll information on the property," including "police records pertaining to drugs, shootings, [and] criminal activity in

[the] last 10 years." The records from ICPH and the Island County Sheriff's Office (ICSO) revealed years of reports of drug activity on the property, including suspected manufacturing of methamphetamine.

In June 2014, neighbor Jewel Enger contacted ICSO to report "a constant stream of people coming and going from the location," including many teens. According to Enger, "[S]ometimes they are so messed up that they have to hold each other up while standing at the bus stop." The ICSO report states Enger said it was an " 'obvious drug house.' " In October 2014, ICSO received specific information about methamphetamine on the premises. A caller who had been squatting at the home reported methamphetamine trafficking.[1] She reported that the house was " 'polluting the island, it is saturated with meth.' " She also said that deputies had done nothing despite knowing it was a "drug house."

A month later, the president of the homeowners association (HOA) that includes the 505 Michelle Drive property contacted ICPH to complain about "suspected drug activity" and to ask "why the drug task force was not doing anything about it." ICPH told the HOA president to contact the ICSO, but the ICSO had referred him to ICPH.

In March 2015, an ICPH environmental health specialist and solid waste coordinator wrote an e-mail to other ICPH employees, describing the property as "very complex" and "not a safe place." The coordinator had taken photographs but "was only able to capture half of the property due to safety measures." She also stated that the Island County Planning Department posted "a cease and

---

[1] She also told the ICSO that there was stolen property at the house and a "chop shop in the garage."

desist order" on the property "because the occupants were tearing down the metal shop," leaving "large amounts of garbage."

ICPH and ICSO report logs show multiple calls to the agencies about the property, including complaints about strong chemical smells and drug manufacturing. In April 2015, a nearby property owner called ICPH because he "believes meth is being cooked" at the house. The same day, neighbor Enger again reported a "strong chemical smell for over a week. The last 5 days it is worse so when she goes outside her eyes water, she can't breathe and gets wheezy." In her report to the ICSO, Enger described "the smell of chemicals being used to make drugs." The ICSO explained to Enger its "limitation in entering a private home" and recommended she report "a public health/nuisance violation" to the county.[2]

In October 2015, a contractor working to clean up the property contacted ICPH to ask whether "there was any prior history of Meth manufacturing for the property." He joked, "Sounds like this place is pretty familiar to about everyone in that office!! (lol)."[3] While working at the property, "several neighbors" warned him that there was a "significant history" of methamphetamine manufacturing in the interior of the home and in a trailer parked in the driveway. The contractor told ICPH:

> After learning a little about the signs and symptoms for meth labs, I
> immediat[e]ly stopped working and felt it necessary to contact you
> guys or the Sheriff[']s department for any insight. There were
> nearly 50 gas cans, countless plastic bottles, short lengths of hose

---

[2] Enger made a report to ICPH two days later.

[3] In this context, "lol" likely means "laugh out loud" or "laughing out loud."

4

(everywhere), 15 or 20 propane tanks, many antifreeze bottles, e[tc.] . . . .

. . . .

I also uncovered MANY needles.

The contractor said that when he stopped working, he experienced dizziness, "severe headache, rapidly developing sore[ ]throat," and overall fogginess. The contractor asked ICHP whether there was information on "any possible hazard" on the property and a way to test the interior and exterior of the home for contamination before he continued working on the property. ICPH told him the property had an established history of "drug activity" but no record of drug "manufacturing." ICPH referred the contractor to the ICSO for more information and suggested he contact the Washington State Department of Health (DOH) Anonymous Meth Hotline to report a possible lab site. Also in October, another contractor cleaning the property reported to ICSO that she found " '[thousand]s of needles,' several baggies appearing to contain . . . controlled substances," and a gun.

After discovering the long history of drug activity on their property, the Perillos contacted a DOH certified drug-lab-cleanup contractor to test the house for contamination. They received the results in an April 2017 assessment report. Samples throughout the house showed methamphetamine residue in excess of legal limits. For example, the kitchen cabinets had a contamination level of 24 micrograms per 100 square centimeters, well above the Washington State methamphetamine cleanup guideline of no more than 1.5 micrograms per 100

square centimeters.[4]  Due to these high levels of residue, the assessment report recommended the house remain unoccupied until after proper decontamination. The report recommended ripping the house down to the studs to remediate the contamination at a cost of about $110,000.

Further testing in February 2018 revealed methamphetamine residue in the living room wood framing, roof sheeting, and concrete floor near the hot water tank.  The second assessment report concluded that because of the contamination found in the framing and roof, remediation might not achieve habitable levels.  Given this concern, the Perillos chose to demolish the house at a cost of $85,610.

The Perillos sued View Sun Investments LLC, the seller of the property, for breach of contract, fraud, and violation of the Consumer Protection Act, chapter 19.86 RCW.[5]  The Perillos also brought a claim for negligence against Island County for breaching its statutory duty to inspect the property and inform potential occupants of hazardous chemical contamination.  Island County moved for summary judgment, arguing the public duty doctrine barred the Perillos' claim. The trial court granted Island County's motion and dismissed the claim with prejudice.

The Perillos filed a motion for discretionary review.  A commissioner of this court granted discretionary review under the RAP 2.3(b)(1) obvious error standard.

_____

[4] See WAC 246-205-541(1).

[5] The claims against seller View Sun Investments are not at issue in this appeal.

6

ANALYSIS

We review orders on summary judgment de novo and consider all evidence and reasonable inferences in the light most favorable to the nonmoving party. Kim v. Lakeside Adult Family Home, 185 Wn.2d 532, 547, 374 P.3d 121 (2016). "Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998) (citing CR 56(c)). The moving party bears the burden of proving there are no issues of material fact. Kim, 185 Wn.2d at 547. The nonmoving party must then "make a showing sufficient to establish the existence of an element essential to [their] case" to avoid summary judgment. Atherton Condo. Apt.-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wn.2d 506, 516, 799 P.2d 250 (1990).

The Perillos filed a negligence claim against Island County.[6] To establish negligence, a plaintiff must show (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). Summary judgment is proper if a plaintiff cannot meet any one of these elements. Ranger Ins., 164 Wn.2d at 552-53. In a negligence action, "the threshold question is whether the defendant owes a duty of care to the injured plaintiff." Schooley v. Pinch's Deli Mkt., Inc., 134 Wn.2d 468, 474, 951 P.2d 749 (1998). The existence of a legal

---

[6] Island County argues that we should dismiss ICPH from the Perillos' negligence claim because it is immune from liability under RCW 64.44.080 and had no duty to act under RCW 64.44.020 without a report of contamination from ICSO. Because ICPH is not a named party to the Perillos' lawsuit, we decline to address these arguments.

duty is a question of law. Schooley, 134 Wn.2d at 474. But "summary judgment is inappropriate where the existence of a legal duty depends on disputed material facts." Afoa v. Port of Seattle, 176 Wn.2d 460, 466, 296 P.3d 800 (2013).

### Duty of Care

The Perillos claim that Island County owed them a duty to inspect the house at 505 Michelle Drive for hazardous chemical contamination when ICSO became aware of possible methamphetamine use and manufacturing on the property. The Perillos argue that Island County's duty of care to them arises under RCW 64.44.020, which provides, in pertinent part:

> Whenever a law enforcement agency becomes aware that property has been contaminated by hazardous chemicals, that agency shall report the contamination to the local health officer. The local health officer shall cause a posting of a written warning on the premises within one working day of notification of the contamination and shall inspect the property within fourteen days after receiving the notice of contamination. . . . .
>     A local health officer may enter, inspect, and survey at reasonable times any properties for which there are reasonable grounds to believe that the property has become contaminated. If the property is contaminated, the local health officer shall post a written notice declaring that the officer intends to issue an order prohibiting use of the property as long as the property is contaminated.

Island County argues that under the plain language of the statute, law enforcement must have "actual knowledge of contamination" to trigger its mandatory duty to report to a local health officer. Island County asserts:

> RCW 64.44.020 does not require law enforcement agencies to report potential contamination [to local health officers], nor are law enforcement agencies required - on pain of tort liability - to follow up on all complaints of drug activity that might lead to knowledge of contamination.

We interpret a statute "to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then [we] must give effect to that plain meaning as an expression of legislative intent." Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). Plain meaning "is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." Dep't of Ecology, 146 Wn.2d at 11. We avoid a literal reading of the statute that results in unlikely, absurd, or strained consequences. Thurston County ex. rel. Snaza v. City of Olympia, 193 Wn.2d 102, 108, 440 P.3d 988 (2019). And we must interpret the language so that no portion of the statute is meaningless or superfluous. Rivard v. State, 168 Wn.2d 775, 783, 231 P.3d 186 (2010).

RCW 64.44.020 mandates the ICSO to report contamination to a local health officer "[w]henever [it] becomes aware that property has been contaminated by hazardous chemicals." The statute defines "contaminated" as "polluted by hazardous chemicals so that the property is unfit for human habitation or use due to immediate or long-term hazards." RCW 64.44.010(2).[7] The statute does not define the term "becomes aware." When the legislature has not defined a term, "we may look to dictionary definitions, as well as the statute's context, to determine the plain meaning of the term." In re Det. of J.N., 200 Wn. App. 279, 286, 402 P.3d 380 (2017) (citing Buchheit v. Geiger, 192 Wn. App. 691, 696, 368 P.3d 509 (2016). The dictionary definition of "become" is "to come to exist or occur." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 195 (2002).

---

[7] RCW 64.44.010(4)(b) expressly defines "hazardous chemicals" to include the controlled substance methamphetamine and manufacturing methamphetamine.

9

The dictionary defines "aware" as "marked by realization, perception, or knowledge : conscious, sensible, cognizant." WEBSTER'S, at 152. Thus, the plain meaning of the statute does not demand "actual knowledge" of contamination to trigger law enforcement's duty to report the contamination to local health officers. Instead, RCW 64.44.020 mandates that once law enforcement comes to the realization or perception that hazardous chemicals are polluting a property, it must report the contamination to local health officers.

Island County's interpretation of RCW 64.44.020 confuses the role of law enforcement with the role of public health officers and creates a threshold for law enforcement action that is impossible to satisfy. Chapter 64.44 RCW and the WACs establish law enforcement's role as reporting potential hazardous chemical contamination to local health officials. See RCW 64.44.020. The role of local health officials is to inspect property that may be contaminated and determine whether the property is actually contaminated by hazardous chemicals. See RCW 64.44.020, .070. The WACs govern that process, including acquiring data from the property and using analytical results obtained through sampling as a method to determine contamination. See WAC 246-205-510, -530, -531. The statutory division of duties properly assigns the role of inspecting the property to public health—the organization with the resources and expertise necessary to sample and test air, surfaces, and soil to assess whether the property is actually "polluted by hazardous chemicals so that [it] is unfit for human habitation or use." RCW 64.44.010(2). Confusing the two agencies' roles leads to a meaningless statute because law enforcement does not have the

resources and expertise to acquire "actual knowledge" that a property is contaminated at unhealthy levels.

Island County's interpretation of RCW 66.44.020 also eliminates the role of the local health officer. The statute states that once the local health officer receives a report of potentially contaminated property from law enforcement, it "shall cause a posting of a written warning on the premises within one working day of notification of the contamination and shall inspect the property within fourteen days after receiving the notice of contamination." RCW 64.44.020. The initial warning by the local health officer—not law enforcement—"inform[s] the potential occupants that hazardous chemicals may exist on, or have been removed from, the premises and that entry is unsafe." RCW 64.44.020. After inspection and a finding of contamination, the local health officer must issue an order "declaring the property unfit and prohibiting its use." RCW 64.44.030(1). The health officer must serve the order on all occupants and interested parties, as well as post the order "in a conspicuous place on the property." RCW 64.44.030(1). The health officer must then report the property to DOH, who maintains a list of contaminated properties made available to the public. RCW 64.44.020. If the statute required law enforcement to report contamination to health officers only when they have "actual knowledge" that the property is contaminated by hazardous chemicals, the statutory role and responsibilities of the local health officer would be superfluous.

Other WAC provisions pertaining to contaminated properties also support our conclusion that the plain meaning of RCW 64.44.020 does not require actual

11

knowledge of contamination to trigger a report to local health officers. Under WAC 246-205-520(1), a local health officer must post a written warning on a property within one working day of notification from law enforcement of "potential contamination." And WAC 246-205-530 requires that the local health officer inspect "potential property contamination" within "fourteen days after a law enforcement agency" notification.

We conclude that the plain meaning of RCW 64.44.020 imposes a duty on law enforcement to report to local health officers when it has information that causes it to realize or perceive that hazardous chemicals are polluting a property.

Whether ICSO had sufficient information to trigger its duty here is a question for the trier of fact. Afoa, 176 Wn.2d at 466. In their opposition to Island County's motion for summary judgment, the Perillos produced evidence that neighbor Enger informed ICSO in June 2014 that 505 Michelle Drive was an " 'obvious drug house' " with a "constant stream" of clearly intoxicated visitors. Enger again reported in April 2015 a "strong chemical smell" emanating from the house for a week, that the smell was like chemicals "used to make drugs," and that it was "so strong" she "could not open the window to [her] residence."[8] A squatter on the property also told the ICSO of methamphetamine trafficking at the house and that the property was " 'saturated with meth.' " And in October 2015, a contractor cleaning the property reported that she found thousands of needles on the property, along with a gun and several baggies that looked to contain or once contain drugs. Viewing this evidence in the light most favorable

---

[8] Enger and other neighbors reported similar complaints to ICPH.

12

to the Perillos, they have made a sufficient showing to avoid summary judgment on the question of whether law enforcement owed them a duty under RCW 64.44.020.

Public Duty Doctrine

Island County contends that any duty of care it owes under RCW 64.44.020 is solely to the public at large, "not individual occupants of property." Accordingly, it asserts that the public duty doctrine bars the Perillos' claim. The Perillos argue that the legislative intent exception to the public duty doctrine applies to their claim because they are among the class of people chapter 64.44 RCW protects. We agree with the Perillos.

No matter if the defendant is a private individual or government entity, the existence of a duty to the plaintiff is the threshold issue in a negligence claim. Babcock v. Mason County Fire Dist. No. 6, 144 Wn.2d 774, 784-85, 30 P.3d 1261 (2001). But "[t]o establish a duty in tort against a governmental entity, a plaintiff must show that the duty breached was owed to an individual and was not merely a general obligation owed to the public." Beltran-Serrano v. City of Tacoma, 193 Wn.2d 537, 549, 442 P.3d 608 (2019). The public duty doctrine provides "a tool to analyze whether a mandated government duty was owed to the public in general or to a particular class of individuals." Munich v. Skagit Emergency Commc'n Ctr. d/b/a Skagit 911, 175 Wn.2d 871, 888, 288 P.3d 328 (2012) (Chambers, J., concurring).

Four named exceptions to the public duty doctrine provide for liability of a government entity even in the face of performing otherwise public duties. Ehrhart

v. King County, 195 Wn.2d 388, 400, 460 P.3d 612 (2020). The exceptions are (1) legislative intent, (2) failure to enforce, (3) the rescue doctrine, and (4) special relationship. Ehrhart, 195 Wn.2d at 400. "A determination that an exception to the public duty doctrine applies is tantamount to a conclusion that [a government entity] owed a duty to the plaintiff." Yonker v. Dep't of Soc. & Health Servs., 85 Wn. App. 71, 77, 930 P.2d 958 (1997).

"The legislative intent exception [to the public duty doctrine] recognizes that the legislature may impose legal duties on persons or other entities by proscribing or mandating certain conduct." Washburn v. City of Fed. Way, 178 Wn.2d 732, 754-55, 310 P.3d 1275 (2013). The exception applies when the terms of a statute show "a clear legislative intent to identify and protect a particular class of persons." Weaver v. Spokane County, 168 Wn. App. 127, 139, 275 P.3d 1184 (2012). A member of a statutorily identified class may bring a tort action against a governmental entity for violating the statute. Honcoop v. State, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988). The intended class must be "particular and circumscribed." Ravenscroft v. Wash. Water Power Co., 136 Wn.2d 911, 929, 969 P.2d 75 (1998). And the provision must clearly express legislative intent. Ravenscroft, 136 Wn.2d at 930. We typically look to the legislature's statement of purpose to determine the statute's intent. Washburn, 178 Wn.2d at 754-55.

RCW 64.44.005 articulates the legislative intent behind the statutes pertaining to contaminated properties:

> The legislature finds that some properties are being contaminated by hazardous chemicals used in unsafe or illegal ways in the

14

manufacture of illegal drugs or by hazardous drugs contaminating transient accommodations regulated by [DOH]. Innocent members of the public may be harmed by the residue left by these chemicals when the properties are subsequently rented or sold without having been decontaminated.

RCW 64.44.005 clearly identifies "members of the public" who "subsequently" rent or purchase contaminated properties as the "particular and circumscribed" class of people protected by the statute. See Ravenscroft, 136 Wn.2d at 929. To facilitate the legislature's intent, RCW 64.44.020 mandates posted warnings to notify potential occupants of the safety hazard. Additionally, the statute specifically identifies "landlord and realtor organizations" among the groups to whom DOH can provide a list of contaminated properties. RCW 64.44.020. This serves the legislative purpose of chapter 64.44 RCW to notify and protect potential occupants of contaminated properties. See RCW 64.44.005. Finally, legislative history also articulates an intent to prevent harm to the particular class of people at issue in this appeal:

> The legislature finds that the contamination of properties used for illegal drug manufacturing poses a threat to public health. The toxic chemicals left behind by the illegal drug manufacturing must be cleaned up to prevent harm to subsequent occupants of the properties. It is the intent of the legislature that properties are decontaminated in a manner that is efficient, prompt, and that makes them safe to reoccupy.

LAWS OF 1999, ch. 292, § 1.

The Perillos are innocent purchasers of a contaminated property and clearly within the class of people that chapter 64.44 RCW protects. The public

15

duty doctrine does not bar their negligence claim. Reversed and remanded for further proceedings.

Brunner, J

WE CONCUR:

Chun, J.                    Andrus, A.C.J.