IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DESHAYE HARRIS, TIARA HARRIS, EDWARD WALKER, RASHANDRA WALKER, LAKIETA FINISTER, MONIQUE FULLER, <br><br>               Appellants, <br><br> RAESHARI WALKER, TIFFANY JACKSON, EVELINA MCKENZIE, CATHERINE BISHOP, DEMAR ROBERTSON, and MONDRELL ROBERTSON, <br><br>               Plaintiffs, <br><br>         v. <br><br> SEATTLE CHILDREN'S HOSPITAL d/b/a ODESSA BROWN CHILDREN'S CLINIC, <br><br>               Respondent. | No. 83733-8-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION |

CHUNG, J. — Former foster children filed a lawsuit against Seattle Children's Clinic d/b/a Odessa Brown Clinic (OBC) alleging that because OBC failed to report abuse at certain foster care homes, they were subjected to subsequent abuse at those same foster homes. RCW 26.44.030(1) designates certain individuals as mandatory reporters who have the duty to report to law enforcement or the State when they have "reasonable cause to believe that a

child has suffered abuse or neglect." OBC successfully moved for summary judgment dismissal of the claims, and six of the 12 original plaintiffs now appeal.

To establish that OBC owed a duty to a particular child to report abuse, there must be evidence that it had received a "credible written or oral report" alleging abuse or neglect of that child. Additionally, there must be evidence that OBC's failure to report was the proximate cause of the plaintiff's injury. Here, the evidence in the record raises genuine issues of material fact as to whether two of the Appellants, DeShaye Harris and Rashandra Walker, reported abuse to OBC sufficient to trigger a duty to report and whether there is sufficient evidence that the failure to report caused them to be subjected to further abuse. As to the other Appellants, the evidence does not withstand summary judgment, as there is insufficient evidence that they reported abuse to OBC or that they were in, or returned to, the care of the abusive foster families after the disclosure. We therefore reverse the grant of summary judgment as to claims raised by DeShaye Harris and Rashandra Walker and affirm the grant of summary judgment dismissing the remaining Appellants' claims.

FACTS

In a prior lawsuit, twelve adult former foster children, comprised of three sets of siblings, sued the State of Washington and Sound Mental Health (SMH) alleging negligence that caused them to suffer mental, physical, and sexual abuse in foster homes. Catherine Bishop, Demar Robertson, and Mondrell Robertson alleged abuse in the foster homes of Ruby and Freeman Johnson and

Edna and LaWayman Travis.[1] Rashandra Walker, Raeshari Walker, and Edward Walker alleged abuse in the foster home of Tracy and Henry Robinson. Tiffany Jackson and her sister Lakieta Finister also brought claims for abuse while in the Robinson home. DeShaye Harris alleged abuse during her time at the Robinson and Johnson homes. DeShaye's sisters, Monique Fuller, Tiara Harris, and Evelina McKenzie alleged they experienced abuse in foster care with their aunt Shirley Fuller. Plaintiffs resolved their claims against both SMH and the State and obtained a $13 million settlement against the State for failure to investigate reports of foster care abuse.[2] There is no dispute that these former foster children suffered significant, long-term abuse during their time in foster care.

In August 2019, the same plaintiffs filed this lawsuit against Seattle Children's Hospital's Odessa Brown Clinic,[3] alleging "mandatory reporting and investigatory failure pursuant to RCW Chapter 26.44." According to the complaint, "numerous Odessa Brown employees received notice of potentially egregious abuses, but failed to act. These acts include the negligence of Odessa Brown involving repeated reports of ongoing abuse within the foster homes that were never reported and/or therefore properly investigated."

---

[1] The usual practice of the court is to refer to alleged victims of sexual assault by their initials to preserve their anonymity. In this case, Appellants filed their complaint in the trial court with their full names in the caption and use their names in the briefing; their names also appear throughout the record. Therefore, we refer to them by name in this opinion. Because some of the Appellants are siblings and share last names, we use their first names; in doing so, we intend no disrespect.

[2] Tiara did not receive any compensation because she did not recall any abuse at that time.

[3] We refer to defendant/respondent as OBC unless the records specifically identify Seattle Children's Hospital (SCH) as the reporting entity.

On January 21, 2021, OBC filed a motion for summary judgment, arguing that its providers had no legal requirement to investigate potential abuse. OBC also asserted that Appellants failed to produce evidence that they had reported abuse to OBC. OBC claimed that there was no causal connection between the alleged damages and OBC involvement. Finally, OBC raised the statute of limitations to bar any claims stemming from physical and mental abuse. The trial court granted OBC's motion for summary judgment with respect to the claims by DeShaye, Evelina, Edward, Lakieta, Monique, and Tiara. For claims by Catherine, Demar, Mondrell, Raeshari, Rashandra, and Tiffany, the trial court denied summary judgment because "plaintiffs' expert states (somewhat summarily) in a declaration that the mandatory reporting should have prompted an investigation for the State." Appellants filed a motion for reconsideration, which was denied. DeShaye, Edward, Lakieta, Monique, and Tiara filed for discretionary review with this court, alleging under RAP 2.3(b)(1) that obvious error would render further proceedings useless.[4] A commissioner denied discretionary review.

In August 2021, OBC filed two motions for summary judgment—one to dismiss the claims by Catherine, Demar, and Mondrell, and the other to dismiss the claims by Raeshari, Rashandra, and Tiffany. The trial court granted the motion for summary judgment with respect to all claims that OBC failed to investigate allegations of abuse, limiting the claims to mandatory reporting.

---

[4] Evelina did not join in the motion.

Additionally, the trial court granted summary judgment and dismissed any claims for physical or mental abuse as barred by the statute of limitations. The court denied OBC's motion for summary judgment on the remaining claims by Catherine, Demar, Mondrell, Raeshari, and Tiffany, but granted summary judgment and dismissed all of Rashandra's sexual abuse claims as barred by the statute of limitations.

Catherine, Demar, Mondrell, Raeshari, and Tiffany subsequently stipulated to dismissal with prejudice.[5] Rashandra, Edward, DeShaye, Monique, Tiara, and Lakieta filed this notice of appeal.[6]

## DISCUSSION

We review orders on summary judgment de novo. Kim v. Lakeside Adult Fam. Home, 185 Wn.2d 532, 547, 374 P.3d 121 (2016). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998) (citing CR 56(c)).

I.      Applicable Law

Appellants appeal the summary judgment dismissal of their claims for negligence based on OBC's failure to comply with its duty as a mandatory reporter under ch. 26.44 RCW to report abuse to the State. As an initial matter,

---

[5] Appellants state that six of the plaintiffs settled their claims prior to appeal, but does not name which plaintiff settled in addition to the five named in the stipulation.
[6] Evelina does not join in the appeal.

although Appellants alleged physical, mental, and sexual abuse, only the claims relating to sexual abuse survive the statute of limitations. RCW 4.16.340(1).[7]

A negligence claim requires the plaintiff to prove four elements: (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). "If any of these elements cannot be met as a matter of law, summary judgment for the defendant is proper." Id. at 553.

A.      Duty to Report

In a negligence case, "the threshold question is whether the defendant owes a duty of care to the injured plaintiff." Schooley v. Pinch's Deli Mkt., Inc., 134 Wn.2d 468, 474, 951 P.2d 749 (1998). The existence of a legal duty is a question of law. Id. If the defendant owed the plaintiff no duty, the negligence action fails. Folsom, 135 Wn.2d at 671.

Here, the duty at issue arises under the mandatory reporting statute, RCW 26.44.030. The statute requires that when certain listed individuals, including "practitioners," registered or licensed nurses, and psychologists, have "reasonable cause to believe that a child has suffered abuse or neglect, he or she shall report such incident, or cause a report to be made, to the proper law enforcement agency or to the department." RCW 26.44.030(1)(a). For the purposes of the statute, " '[r]easonable cause' means a person witnesses or

---

[7] The parties do not dispute the application of this statute of limitations to the Appellants' claims insofar as they allege physical or mental abuse. Its more specific application to Rashandra's claims is discussed below.

receives a credible written or oral report alleging abuse, including sexual contact, or neglect of a child." RCW 26.44.030(1)(b)(iii). Only receipt of a credible written or oral report of abuse triggers the mandatory reporting provisions of RCW 26.44.030(1)(a).

RCW 26.44.030 implies a cause of action against mandatory reporters who fail to report suspected abuse. Beggs v. Dep't of Soc. & Health Servs., 171 Wn.2d 69, 77, 247 P.3d 421 (2011). To reach this conclusion, the Beggs court applied the test from Bennett v. Hardy:

> [W]e must resolve the following issues: first, whether the plaintiff is within the class for whose 'especial' benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy and third, whether implying a remedy is consistent with the underlying purpose of the legislation.

113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990). As to the first issue, the Beggs court concluded that "victims of child abuse" were within the class for whose "special" benefit the legislature enacted the reporting statute, as " '[t]he reporting statute is designed to secure prompt protection and/or treatment for the victims of child abuse.' " Id. at 77 (quoting State v. Warner, 125 Wn.2d 876, 891, 889 P.2d 479 (1995)). Next, the court concluded that the statute implicitly supported a civil remedy because it provided immunity to persons who in good faith cooperate in an investigation as a result of a report, as it would not need to grant immunity if there were not liability. Beggs, 171 Wn.2d at 78. Finally, a civil remedy was consistent with the legislative intent that the government give the " 'prevention,

7

treatment, and punishment of child abuse the highest priority.' " Id. (quoting LAWS OF 1985, ch. 259, § 1).[8]

The heart of Appellants' argument is that if OBC had reasonable cause to suspect abuse of *any* of the original Plaintiffs, it owed a duty to other children who were placed in that same home, because its report would have resulted in Child Protective Services (CPS) investigations of the foster homes and prevented subsequent abuse of other children in that same home. OBC responds that it had no duty to report because it did not receive a credible report of abuse regarding each of the Appellants. Thus, before we review the evidence of reports of abuse to OBC, we must first clarify the scope of OBC's duty to report.

In support of their argument for a broader duty, Appellants cite H.B.H. v. State, 192 Wn.2d 154, 158, 429 P.3d 484 (2018), which held that the Department of Social and Health Services (DSHS) owes a common law duty to protect dependent foster children from harm because they have a special protective relationship. In H.B.H., children from different biological families were placed together in a foster home and later adopted. Id. at 159-60. Several reports of abuse resulted in no action, but a law enforcement investigation eventually

---

[8] An implied cause of action against mandatory reporters for negligence is also consistent with the statement in the statute's declaration of purpose:

> [T]he Washington state legislature hereby provides for the reporting of such cases to the appropriate public authorities. It is the intent of the legislature that, as a result of *such reports*, protective services shall be made available in an effort to prevent further abuses, and to safeguard the general welfare of *such children*.

RCW 26.44.010 (emphasis added).

revealed abuse and resulted in removal of the children from the home. Id. at 160-61. The former foster children sued DSHS for failing to protect them from abuse in their foster and adoptive home. Id. at 161. After determining that the foster children had produced sufficient evidence that breach of the protective duty caused their injuries, the court turned to the issue of causation: "As for causation, the Court of Appeals correctly credited the jury's ability to draw the inference that 'but for the allegedly deficient health and safety checks, SAH or one of the other girls would have disclosed the abuse and the State would have intervened.' " Id. at 181-82.

Pointing to that statement in H.B.H. regarding causation, Appellants contend "the evidence in this case is even *more* compelling" than in H.B.H., and proper reporting would have given rise to a CPS investigation that spared the children additional abuse. However, the court in H.B.H. reached the issue of causation after already determining that DSHS owed a common law duty to the foster children. Id. at 181. Here, Appellants must first establish that OBC owed them a duty, or their claim fails.

Appellants contend that information about abuse of one person is sufficient to trigger the duty to report suspected abuse of all in the home because such harm is foreseeable and is "within the general field of danger which should have been anticipated." Indeed, in H.B.H., the court applied the concept of foreseeability to define the duty owed by DSHS to foster children, holding that the Department's "special relationship with foster children" "supports recognition of a

duty in tort to protect foster children from foreseeable harms at the hands of foster parents." Id. at 178. However, the Department's duty is rooted in the common law, as stated in the RESTATEMENT (SECOND) OF TORTS § 315(b) (AM. LAW INST. 1965). H.B.H., 192 Wn.2d at 181. By contrast, RCW 26.44.030(1) creates a limited statutory duty to report abuse, not a common law duty to protect foster children. H.B.H. provides no basis for extending the statutory duty owed by mandatory reporters to other children in the same home as the subject of a report.

Finally, in support of its argument that the implied cause of action and the duty extends beyond the subject or subjects of a report, Appellants point to language in the subsection of the statute discussing the discovery rule

> (2) The reporting requirement of subsection (1) of this section does not apply to the discovery of abuse or neglect that occurred during childhood if it is discovered after the child has become an adult. However, if there is reasonable cause to believe other children are or may be at risk of abuse or neglect by the accused, the reporting requirement of subsection (1) of this section does apply.

RCW 26.44.030(2).[9] Read together, RCW 26.44.030(1) and (2) impose a duty to report only where there is either "reasonable cause to believe that a child has suffered abuse or neglect" or, in the case of abuse discovered after the child has become an adult, "reasonable cause to believe other children are or may be at

---

[9] Here, Appellants do not suggest that the disclosure to OBC that triggered the duty occurred after they became adults, but rather, when they were children. We also note that Appellants raise this issue in their reply brief. Generally, we do not consider arguments raised for the first time in a reply brief. In re the Marriage of Sacco, 114 Wn.2d 1, 5, 784 P.2d 1266 (1990); RAP 10.3(c).

risk of abuse or neglect by the accused." RCW 26.44.030 is limited to the duty to report, not the duty to investigate, which stems from RCW 26.44.050.[10] The report must first identify the specific children as to whom there is reasonable cause to believe they have been abused or are at risk of abuse to authorities with the duty to investigate. See, e.g., Rodriguez v. Perez, 99 Wn. App. 439, 445, 994 P.2d 874 (2000) (children who are suspected of being abused also fall within the protected class under chapter 26.44 RCW and may bring suit for negligent investigation). Subsequently, once the reporter reports the suspected abuse, the authorities who receive the report have a separate duty to investigate, under RCW 26.44.050.[11] RCW 26.44.030(2) does not expand the mandatory reporting duty to unknown other children, but rather only "if there is reasonable cause to believe other children are or may be at risk of abuse or neglect by the accused." For abuse or neglect discovered when a child is a minor, the duty to report is owed only to the child who is the subject of a report of abuse or neglect.

---

[10] RCW 26.44.050 imposes a duty to *investigate* and applies to only "the law enforcement agency or the department [of children, youth, and families]" upon receipt of a report alleging that abuse or neglect has occurred. The statute "imposes the duty of investigation upon the authorities who receive the report, not upon those who make the report." Whaley v. Dep't of Soc. & Health Servs., 90 Wn. App. 658, 668, 956 P.2d 1100 (1998). OBC is neither a law enforcement agency nor the department. Thus, the trial court properly held that OBC had no duty to investigate any reports of abuse.

[11] As OBC notes, the duty to investigate under RCW 26.44.050 is limited to the children and families who are the subject of a report. See, e.g., Boone v. Dep't of Soc. & Health Servs., 200 Wn. App. 723, 736-37, 403 P.3d 873 (2017) (Because "RCW 26.44.050 was enacted for the benefit of children or families who are the subject of a report of alleged abuse or neglect," after receiving a report of suspected child abuse or neglect, "the Department has a duty to the particular child and family to investigate with reasonable care . . . [that] does not extend to all children and their families").

B. Causation

Proximate causation consists of two elements—legal causation and cause in fact. City of Seattle v. Blume, 134 Wn.2d 243, 251, 947 P.2d 223 (1997). Legal causation "rests on considerations of policy and common sense as to how far the defendant's responsibility for the consequences of its actions should extend." Taggart v. State, 118 Wn.2d 195, 226, 822 P.2d 243 (1992). Cause in fact refers to the "but for" consequences of an act or the immediate connection between an act and an injury. Blume, 134 Wn.2d at 251-52. Proximate cause requires more than speculation or conjecture. Miller v. Likins, 109 Wn. App. 140, 145, 34 P.3d 835 (2001).

OBC argues that evidence to support the element of causation in a mandatory reporting case must show that if a report was made, the resulting investigation could have prevented further abuse. According to Appellants, "a proper Child Protective Services *investigation* could have discovered that any one of these many plaintiffs and dismissed-plaintiffs would have disclosed the abuses being perpetrated." However, as previously noted, a failure to investigate is a different claim for which a mandatory reporter cannot be held liable. Moreover, as discussed above, the scope of the duty is limited to the specific child about whom there has a been a report of abuse. Thus, proof of causation requires showing that OBC's failure to report was the proximate cause of abuse of a child in the allegedly abusive foster home. It stands to reason that if, at the time of the report, a child is no longer in the home where the abuse is alleged to

have occurred, a plaintiff cannot establish the failure to report is the cause of subsequent abuse of that child, unless that same child remains or returns to the same abusive foster home.

II.     Summary Judgment Evidence

Appellants contend that the trial court erroneously weighed the evidence and made decisions on credibility to grant summary judgment in favor of OBC. OBC argues that Appellants have not provided sufficient evidence of credible written or oral reports alleging sexual abuse to establish its duty to report.

On summary judgment, the moving party has the initial burden of showing the absence of an issue of material fact. In re Est. of Black, 153 Wn.2d 152, 160-61, 102 P.3d 796 (2004). If the moving party is the defendant and meets the initial showing,

> the inquiry shifts to the party with the burden of proof at trial, the plaintiff. If, at this point, the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' then the trial court should grant the motion.

Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)).

In response to a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of a pleading, but a response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." CR 56(e). "An affidavit submitted

in support of or in response to a motion for summary judgment 'does not raise a genuine issue of fact unless it sets forth facts evidentiary in nature, i.e., information as to what took place, an act, an incident, a reality as distinguished from supposition or opinion.' " Johnson v. Recreational Equip., Inc., 159 Wn. App. 939, 954, 247 P.3d 18 (2011) (quoting Snohomish County v. Rugg, 115 Wn. App. 218, 224, 61 P.3d 1184 (2002)).

"The 'facts' required by CR 56(e) to defeat a summary judgment motion are evidentiary in nature. Ultimate facts or conclusions of fact are insufficient. Likewise, conclusory statements of fact will not suffice." Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988), abrogated on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County, 189 Wn.2d 516, 404 P.3d 464 (2017). A declaration that contains only conclusory statements without factual support does not create an issue of material fact to defeat a motion for summary judgment. Lane v. Harborview Med. Ctr., 154 Wn. App. 279, 288, 227 P.3d 297 (2010). However, the non-moving party is not required to "corroborate" their testimony or prove their statements credible. Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 223, 522 P.3d 80 (2022). The court does not weigh evidence or assess credibility on summary judgment. Id. at 218.[12]

_____

[12] While corroborating evidence is not required to survive summary judgment, the specific claims in this case require evidence that OBC's duty to report was triggered. Specifically, the relevant statute requires evidence that the mandatory reporter had "reasonable cause to believe that a child has suffered abuse or neglect," which means the person "witnesses or receives a credible written or oral report alleging abuse" or neglect. RCW 26.44.030(1)(a), (b)(iii) (emphasis added). Again, however, the court does not assess the credibility of the report; rather, at

On summary judgment, OBC put forth medical records, or pointed to the lack thereof, to establish that it did not receive reports of abuse amounting to reasonable cause to trigger RCW 26.44.030. In response, Appellants must provide evidence of specific facts—"what took place, an act, an incident, " Johnson, 159 Wn. App. at 954—that show OBC had written or oral reports of abuse from each individual Appellant.[13]

As discussed above, OBC owed a duty only to those children about whom it had reasonable cause to believe had suffered abuse. Therefore, we review the evidence in the record in the light most favorable to the Appellants to determine whether there are questions of fact as to each individual Appellant's disclosure of

---

summary judgment, the court determines whether there is evidence creating a genuine issue as to whether the mandatory reporter received a credible written or oral report of abuse.

[13] OBC asserts that the Appellants provided contradictory responses to interrogatories in a different case and that their subsequent declarations cannot raise genuine issues of material fact to defeat summary judgment. In their prior lawsuit against the State and Sound Mental Health, the Appellants answered interrogatories asking to whom they disclosed the abuse by naming only SMH counselors and DSHS caseworkers. With the exception of Edward (discussed below), none of the Appellants included OBC or Seattle Children's Hospital among the entities to whom they had disclosed abuse in their foster homes.

Generally, "a party cannot create an issue of material fact by filing an affidavit that contradicts the party's prior statements without explanation." In re Kelly and Moesslang, 170 Wn. App. 722, 738, 287 P.3d 12 (2012). This rule has also applied to interrogatories: "When answers to unambiguous interrogatories clearly eliminate any genuine issue of material fact, a party cannot thereafter create such an issue merely by contradicting, without explanation, previous admissions." Dep't of Lab. & Indus. v. Kaiser Alum. & Chem. Corp., 111 Wn. App. 771, 778, 48 P.3d 324 (2002). However, the rule is narrow in that the affidavit must directly contradict the previously given "unambiguous sworn testimony." Taylor v. Bell, 185 Wn. App. 270, 294, 340 P.3d 951 (2014). None of the cases address the issue here, where OBC looks to bind the Appellants to their answers to interrogatories from a prior lawsuit involving different parties.

Ultimately, the contradictory responses to interrogatories raise issues of credibility. However, credibility is not a consideration for summary judgment. Haley, 25 Wn. App. 2d at 218 (a trial court does not assess credibility on summary judgment). Rather, the court must view the evidence in the light most favorable to the non-moving party. Kim, 185 Wn.2d at 547.

abuse to OBC, and whether OBC's failure to report caused the individuals to suffer sexual abuse in the homes of the same foster families.[14]

Appellants provided an expert declaration from David Stewart, who evaluated medical records and opined that they triggered OBC's mandatory duty to report abuse with respect to plaintiffs not party to this appeal—Raeshari, Mondrell, Catherine, and Demar. According to Stewart, a report by OBC about Raeshari's abuse would have identified ongoing abuse and prevented future abuse in the Robinson home. Stewart gave a similar opinion about continuing abuse in the Johnson home that should have been reported based on medical records for Catherine. These statements as to plaintiffs who are not parties to this appeal cannot establish duty or causation for Appellants. The limited scope of the reporting duty means that failure to report Raeshari's or Catherine's allegations of abuse will not provide evidence of reporting that triggers a duty for the other children.

We address the additional evidence separately as to each Appellant.

A.      DeShaye Harris

DeShaye Harris lived in three separate foster homes about which there were serious allegations of abuse by her and others. She lived in the Robinson home from May 28, 1993 to October 7, 1993, and again from June 11, 1996 to

---

[14] While only the claims of sexual abuse survive the statute of limitations, RCW 4.16.340(1), the "credible written or oral report alleging abuse" need not have alleged sexual abuse specifically to trigger the mandatory reporting duty. In other words, a report of physical or mental abuse could have triggered the reporting duty, but the plaintiff still must show a causal connection between the failure to report and resulting sexual abuse.

January 30, 1997; the Fuller home from October 8, 1993 to August 16, 1994; and the Johnson home from January 31, 1997 and April 2, 2002. She alleged physical and sexual abuse in the Robinson and Johnson homes.

In response to OBC's interrogatories requesting the names and occupations of "each and every person you claim has knowledge of any of the alleged acts or omissions committed by Defendant Odessa Brown Children's Clinic which you claim were negligent or otherwise wrongful," DeShaye stated,

> I cannot recall the specific names of the Odessa Brown employees without referencing the records. Even with the records given my age at the time, I am more likely to recall what I said versus the specific individual. Incorporate by reference any records available, past, present and future. The reports are included in my records.

She described the sexual abuse that occurred in the Robinson and Johnson houses, and stated that she told her "counselor" details about the abuse. She provides no specifics as to the identity or location of the counselor. When asked to identify whom she had told about the abuse, DeShaye stated that she told OBC staff she did not want to remain in the Robinsons' house due to physical abuse including hitting, belittling, and neglect.

After OBC moved for summary judgment, DeShaye submitted a declaration stating that she was an OBC patient between 1990 and 2005 and saw several providers. She reiterated the statement from her interrogatories that she told OBC employees about the physical and emotional abuse at the Robinson house.

17

Her declaration included excerpts from medical records from OBC visits that she claims "document instances of sexual abuse."[15] The first document is a chart record entered in June 1990 when DeShaye was two years old. The note states that DeShaye was living with her maternal aunt, children are in the custody of CPS, and "mother states that sexual assault has occurred with this child long ago??" A contemporaneous entry in the chart's list of "major problems" includes "sexual abuse high risk." However, the evidence does not show that DeShaye had lived with the Robinsons or Johnsons prior to or at the time this chart note was made in 1990. Similarly, the list of "episodic problems" in the chart notes includes "behavioral problems" in June 1994, when DeShaye was living with the Fullers, rather than with either the Robinsons or Johnsons.

DeShaye recalled, "On various occasions, the subject of my sexual abuse arose with my abusers, the Robinsons, having escorted me to the visits at Odessa Brown. I was very vocal about being abused. I also recall discussing being abused during my treatment for warts in 1997."[16] The record includes a chart note from August 25, 1997, that references warts, as well as her foster mother's concern about temper outbursts and masturbating with stuffed animals,

---

[15] Appellants stated that some of their alleged reports of abuse to providers are not documented due to OBC's "purging of files." However, Appellants do not argue, and have not shown, that OBC spoliated evidence. The lack of medical records itself is not fatal to the claims; it is not necessary to corroborate Appellants' statements. But whether through medical records, their statements, or other evidence, Appellants must satisfy their burden at summary judgment to set forth specific facts showing there is a genuine issue for trial. CR 56(e).

[16] The record contains one OBC medical chart entry called the "pediatric master problem list" included a column of "major problems" with a 1997 entry for "behavior problems." However, this entry includes no specific date that corresponds to the time that DeShaye lived with the Robinsons, nor does it specify any disclosure of abuse.

18

but this note does not indicate any disclosure of abuse. Moreover, because DeShaye did not return to the Robinson household after she left in January 1997, her disclosure at an appointment in August 1997 chart note cannot support a claim that this report would have prevented any subsequent abuse by the Robinsons.

The record also contains DeShaye's deposition testimony. When asked, "[W]hile you were in the Robinson home and you were sexually abused by Isaac, and you were attending Odessa Brown, did you inform anyone at Odessa Brown . . . of the abuse you endured in the Robinson home?", DeShaye replied that she did, and while she could not remember the woman's name, she could describe her: "She was a White lady. She had to be about 5'5", 5'6". She had a bob haircut. She was really on the thinner side. And they always when I went there always, took me to the last room down the hall . . . next to the exiting door." Asked if she knew what kind of provider the woman was, DeShaye responded, "I'm hoping she [wa]s a doctor, because she saw me and she had on the long white jacket."

DeShaye's deposition testimony described the content of her disclosure: "I told her that my foster mom's brother was having sex with me, he was poking me." DeShaye further elaborated,

> I remember telling them what exactly was going on. I remember telling them that I was -- that they are poking me with their penis. I remember telling them that, you know, Isaac was having his mouth on my vagina and fingers in me. I remember telling them that Junior was creeping in my room every night, sticking his big old penis inside of me.

19

I remember exactly which rooms I was in because for some reason I was never able to go to the rooms that were close to the little play area. I was always in the rooms towards the exit door.

DeShaye's deposition testimony provides evidence of whom she told at OBC and details of the abuse while she lived at the Robinsons. Further, while she did not live with the Robinsons again after her August 1997 appointment, during which she alleges she discussed her abuse, viewed in the light most favorable to her, the record includes evidence that she also disclosed the abuse to OBC at other times while she was still living with the Robinsons. Her declaration states, "On various occasions, the subject of my sexual abuse arose with my abusers, the Robinsons, having escorted me to the visits at Odessa Brown. I was very vocal about being abused." Further, her deposition testimony suggests she discussed abuse that was contemporaneous with the visits to OBC, while she was at the Robinsons: "I remember telling them what exactly was going on," "they are poking me with their penis," "Isaac was having his mouth on my vagina and fingers in me," and "Junior was creeping in my room every night."

While there are no medical records of OBC visits other than the ones in 1990 and August 1997, DeShaye submitted a declaration stating that she was an OBC patient between 1990 and 2005 and saw several providers, and OBC does not contest that she was an OBC patient. Because DeShaye has provided specific facts showing that there is a genuine issue for trial on her claim against OBC, the trial court erred by granting summary judgment on her claim.

B.     Monique Fuller

Monique is DeShaye's younger sister. Monique alleges she was abused while in foster care with her aunt, Shirley Fuller, with whom she lived from October 8, 1993 to December 22, 1994 and August 1, 1997 to April 6, 2000.

Monique initially answered OBC's interrogatories with the same broad statement as did her sister DeShaye, that she "cannot recall specific names of the Odessa Brown employees without referencing the records" and "given my age at the time, I am more likely to recall what I said versus the specific individual." Then, her interrogatory answers state that she informed "my DSHS case worker and my SMH counselor" that she "didn't like being at the Fuller home because Roland and Randy were making me and my sister Tiara do sexual things to both Roland and Randy" and that she "told SMH that the boys would take nude pictures of themselves while making me and my sister watch." In response to the interrogatory asking her to identify all persons to whom she reported the abuse described in the previous interrogatory response and when she reported it, Monique answered as follows:

> In addition to the many others I told about the abuse that was going on in the Johnson home. I told my counselors assigned to me at that time that Lawayman would pull my pants down and he would touch my breast, vaginal and bare buttocks. Oral sex was performed as well.
> I told my counselors assigned to me at that time that Rudolph would pull my pants down and he would touch my breast, vaginal and bare buttocks. Oral sex was performed as well.

Then, in her declaration in response to the summary judgment motion, Monique supplemented the interrogatories by stating that she reported the sexual

abuse at the Johnson home to her counselor at OBC, and "recently pulled up an image of Odessa Brown online to confirm the image was the same place that I reported." She also clarified that the reports about abuse occurring in the Johnson home were made to OBC employees, even though the interrogatory had stated she reported the abuse to SMH counselors.

However, placement records show that Monique was never placed in the Johnson home.[17] Appellants claim that reference to the Johnson home was a "typo" and that "[i]n violation of the most basic summary judgment principles, the trial court decided that the DSHS records took precedent over Ms. Fuller's testimony and summarily declared that her testimony simply could not be true." But for purposes of summary judgment, these inconsistencies are not the issue. Rather, the problem is that neither DSHS records nor her statements provided evidence to satisfy Monique's burden, as the nonmoving party at summary judgment, to set forth specific facts showing that she told OBC about abuse at the Fuller home.

The record includes an answer to an interrogatory that states Monique told counselors about sexual acts being perpetrated by "Lawayman" and others by "Rudolph." Lawayman refers to LaWayman Travis from the Travis foster home. Rudolph Valentino was associated with the Johnson home. Monique's DSHS

---

[17] The trial court referenced this contradiction in its denial of Plaintiffs' motion for reconsideration: "Ms. Fuller further explained that she reported 'abuse that was going on in the Johnson home.' However, Ms. Fuller was not a foster child in the Johnson home when she was a patient at OBC. Accordingly, there is no evidence that Ms. Fuller could have reported abuse that was occurring in the Johnson home to OBC."

records do not include placement at either the Johnson or Travis home. Monique's declaration repeats the exact language from the interrogatory answer, describing what she told her counselors about abuse in the Johnson home. Her declaration adds that she answered the question "in relation to the Odessa Brown employees" and that she looked at an online image of OBC to confirm it as the place she reported the abuse. However, the evidence that Monique told OBC about abuse by Lawayman and Rudolph does not raise a question of fact as to whether she told OBC about abuse at the *Fuller* home.

In support of the motion for reconsideration, Monique submitted a second declaration, where she clarified her placement history and that she had been sexually abused in the Fuller home. She asserted, "I reported the sexual abuse. The sexual abuse occurred in 1994, during my first placement in the Fuller home, and for years after, including 1997 and beyond." However, in this declaration, Monique did not state to whom she reported; she did not name OBC generally or a specific provider. The only description of the abuse at the Fuller home is in Monique's interrogatory answer, where she states she reported this abuse to SMH. Neither of Monique's declarations clarify that her interrogatory answers about reporting abuse at the Fuller house related to OBC instead of SMH.

Monique states in her declaration that she was a patient at OBC between 1990 and 1999. This includes the time periods when she was placed with the Fullers. Monique stated that she believes that her first report of abuse to OBC medical staff occurred "when I attended for medical visits in the mid 1990s during

23

my outpatient visits and when I was placed in the Fuller foster home." In her declaration, she referenced records provided by OBC in discovery that indicate Monique was seen by seven different providers, but without corresponding dates. She noted that many of her records were handwritten and illegible, and in her declaration, included a small excerpt from a largely illegible medical record.[18] The record entry is dated November 20, 1995, and includes the word "police." The record excerpt dates from almost a year after she left the Fuller foster home in December 1994 and substantially before she returned to that placement in August 1997. The medical record has no specific information about abuse, other than the reference to "police" in its illegible context.

Also dated November 20, 1995, a contemporaneous letter addressed to "CPS/DCFS" from SCH child abuse and neglect consultant Dr. Kenneth Feldman sheds light on the medical record note. Dr. Feldman discussed an examination conducted when Monique's mother brought her for evaluation after calling the police for a welfare check because she heard that a referral had been made for "possible physical abuse." The police found "no difficulties" but recommended a physician exam. Dr. Feldman interviewed Monique alone and conducted a physical exam. He included detailed notes of his observations, including no cranial injuries, normal tympanic membranes, and bilateral rhinitis. He also noted

---

[18] The record custodian for CH notes that "exam has past our retention period" in response to Monique's request for medical records.

that "no genital injuries are seen external to the labia," and "no indication of recent injury nor is such described by a child."

The evidence does not create a question of fact that the "possible physical abuse" occurred at the Fullers, as Monique had not been there for almost a year. Moreover, Dr. Feldman's evaluation did not reveal signs of abuse. Even if there were a question of fact as to whether he had reasonable cause to believe that Monique had suffered abuse or neglect, and thus had a duty to report, the evidence does not show a failure to report; it shows that Dr. Feldman did report his examination and the mother's concerns of possible abuse to CPS/DCFS.

Monique's declaration stating that she reported sexual abuse to her counselor at OBC pertains to a foster family at whose home she was never placed. The evidence does not establish that OBC received reports of abuse of Monique that triggered a duty to report under RCW 26.44.030. Because Monique cannot demonstrate that OBC owed her a duty, OBC was entitled to a judgment as a matter of law dismissing her claims.

C.      Tiara Harris

Tiara is the youngest sister to DeShaye and Monique. Like her sisters, Tiara responded to OBC's interrogatories by incorporating her medical records and making a general statement that she could not recall specific names of OBC employees. Tiara's answers to interrogatories propounded by SMH in the prior case relied on the abuse experienced by her sister DeShaye. In this case, she

25

relies on abuse experienced by Monique. She also provided general answers to questions about her abusers:

> My memories of being abused in the Fuller home, and other foster settings, are vague and newly evolving in accord with RCW 4.16.340. It is my understanding that some DSHS dependency documents corroborate my having been violated. To the extent that I can recall, I was young, and based upon my limited memories and the information that I have been told from other people in my life, it is my belief that I too experienced abuse in the home in the same or similar ways as my sister, Monique Fuller Harris.

Tiara stated that she told OBC staff that she did not want to remain in the Fuller home due to physical and mental abuse and neglect. The interrogatory answer provides no timeframe for her reports.

Unlike her sisters, Tiara did not submit a declaration in response to the summary judgment motion, and the record contains few medical records. One record, a Seattle Children's medical report from a July 1995 evaluation at the child abuse clinic, notes that three-year-old Tiara had visible injuries that were "highly concerning for inflicted injury." The injuries included a scar over her jaw, which Tiara had told her teacher was from her mother hitting her with a belt; her mother said she had walked into a cigarette at a family party. Tiara was brought to OBC for that medical assessment by two representatives from CPS. The fact that the examination occurred at the behest of CPS and in the presence of CPS representatives obviated the need for a separate report of possible abuse to CPS.

The evaluation also noted that during a recent interview with CPS, Tiara's mother expressed that "while the child was in foster care prior to 12/94, she and

26

her siblings had been sexually abused."[19] Additionally, the evaluation notes that OBC saw Tiara for well child care between July 1992 and January 1993 and those "well child examinations were essentially benign," indicating no record of abuse reported to OBC while she was still in the allegedly abusive home.

While the child abuse clinic evaluation mentions that Tiara had been sexually abused in foster care, the report was of abuse that had occurred at least six months prior. CPS relayed the statement from Tiara's mother as part of the child's medical history. That evidence of abuse came to OBC *from a CPS worker* as it pertained to Tiara's history. Thus, any report from OBC would have merely provided the same information back to CPS.

Because CPS already knew of the alleged abuse, Tiara cannot demonstrate that OBC's failure to report perpetuated the abuse. Tiara has not put forth any other evidence of reports of abuse to establish that OBC owed her a duty to report. Nor does the evidence establish causation, as OBC would have been reporting the same information it had received from CPS back to CPS. OBC was entitled to summary judgment as a matter of law.

D.    Rashandra Walker

Rashandra claims she disclosed to OBC sexual abuse she suffered while living in the Robinson home. The trial court granted summary judgment and

---

[19] The summary judgment record does not contain a foster placement record for Tiara, and she does not state when she was at the Fuller home. Her sister Monique stated in her declarations that Tiara was with her "much of the time" at the Fullers. Monique's placement records show she went to the Fuller home in October 1993 and returned home in late December 1994. Monique subsequently lived in two additional foster homes, not at issue in this case, from February 1996 to July 1997. Monique returned to the Fullers in August 1997.

dismissed Rashandra's claim as time-barred under the statute of limitations. Because we determine that the claim is not time-barred, we also address whether the record establishes a question of material fact regarding her claims.

1.      Statute of Limitations

On appeal, Rashandra argues the trial court erred by granting summary judgment and dismissing her claim as time-barred under RCW 4.16.340(1)(c) because she identified six newly discovered injuries arising out of the sexual abuse. We agree that dismissal based on the running of the statute of limitations was legal error.

RCW 4.16.340 establishes the statute of limitations for claims related to childhood sexual abuse:

> (1) all claims or causes of action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within the later of the following periods:
>
> (a)      Within three years of the act alleged to have caused the injury or condition;
> (b)      Within three years of the time the victim discovered or reasonably should have discovered that the injury or condition was caused by said act; or
> (c)      Within three years of the time the victim discovered that the act caused the injury for which the claim is brought:
>
> PROVIDED, That the time limit for commencement of an action under this section is tolled for a child until the child reaches the age of eighteen years.

RCW 4.16.340(1)(c) will bar a claim only if more than three years have passed from the time the victim discovered a causal connection between the abuse they suffered and an injury for which the claim has been brought. Hollman v.

Corcoran, 89 Wn. App. 323, 334, 949 P.2d 386 (1997). "RCW 4.16.340 makes it clear that a plaintiff's cause of action does not accrue until she knows that the sexual abuse caused her more serious injuries." Korst v. McMahon, 136 Wn. App. 202, 210, 148 P.3d 1081 (2006). The party asserting the affirmative defense of the statute of limitations has the burden of proof and must offer evidence that the plaintiff realized a causal connection between the wrongful conduct and their injuries more than three years prior to filing suit. Wolf v. State, 2 Wn.3d 93, 111, 534 P.3d 822 (2023).

RCW 4.16.340(1)(c) has been applied in two types of cases: first, "when a victim is aware of the abuse and that they suffered harm as a result, but the victim discovers a new and qualitatively different injury from the abuse," and second, "when the victim is aware of the abuse and injury but discovers a causal connection of which they were previously unaware between the wrongful act and the harm." Wolf, 2 Wn.3d at 105; see also Carollo v. Dahl, 157 Wn. App. 796, 801, 240 P.3d 1172 (2010). The harm must be a qualitatively new harm, rather than merely an increase in severity of an existing harm. Carollo, 157 Wn. App. at 802.

For example, in B.R. v. Horsley, the plaintiff raised an issue of material fact as to whether her claim was time-barred by presenting evidence of new harms discovered during counseling despite having struggled with serious symptoms of her abuse for years before. 186 Wn. App. 294, 303, 345 P.3d 836 (2015). The new harms included problems with intimacy, with her employment,

29

and discomfort with her religion. B.R., 186 Wn. App. at 303-06. In contrast, the claims in Carollo were time-barred where the plaintiff demonstrated only more severe manifestations of his pre-existing PTSD and an inability to continue controlling his existing symptoms. 157 Wn. App. at 802.

Here, Rashandra established an understanding of her injuries during a deposition on May 21, 2021. She testified that she was uncomfortable around men and disliked being touched as a result of the sexual abuse. When asked to clarify if she could identify any other ways the childhood abuse affected her, her response was "no." During this deposition she revealed that she made the connection between her abuse in the home and these injuries not long after leaving the home.

Subsequently, during the course of preparing for trial, Rashandra was psychologically evaluated by several medical professionals, including Dr. Klein, and those evaluations were reviewed by Dr. McGovern. In both examinations, Rashandra was diagnosed with PTSD symptoms as well as anxiety, and depression. To Dr. McGovern, Rashandra revealed she has been aware of the existence of her anxiety and depression as well as its ties to her childhood abuse for some time.

In response to OBC's motion for summary judgment, Rashandra filed an additional declaration describing newly discovered ways she was impacted from

her abuse including diagnosis of enuresis,[20] lack of desire for children, inability to finish high school or get a GED, sexual preferences for women, and difficulty in obtaining steady employment. She claims that as a result of recent mental health evaluations she is "able to articulate many more ways that the abuse impacted [her] that [she] did not previously understand."

Several of these injuries are qualitatively different from the previously identified discomfort with men and touch. While Rashandra knew of her diagnosis of enuresis, she may not have understood its connection to sexual abuse. The lack of desire for children is a recognizable injury that courts have considered to be a specific injury. B.R., 186 Wn. App. at 303. Additionally, sexual preference or confusion may also be a specific injury related to sexual abuse, as is difficulty obtaining steady work. Id. at 303-04.

OBC argues that Rashandra's contradictory testimony cannot raise an issue of material fact. Indeed, Rashandra's statements at her earlier deposition were unambiguous. She was uncomfortable with men and being touched, and she realized this soon after leaving the Robinson home. In her deposition when she was asked if her abuse had affected her in any other way, she clearly answered "no." Generally, when a party gives a clear answer in a deposition, that party cannot create an issue of material fact with an affidavit that merely conflicts, without explanation. Marshall v. AC & S Inc., 56 Wn. App. 181, 185, 782 P.2d

---

[20] Enuresis is "an involuntary discharge of urine," or "incontinence of urine." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 759 (2002).

1107 (1989). However, Rashandra explained that she had never had access to professional consultation or meaningful counseling until litigation. Like the plaintiff in B.R., who discovered additional harms through subsequent therapy, Rashandra's evaluations with Drs. Klein and McGovern allowed her to have further introspection on the impacts of abuse.

Thus, Rashandra raised genuine issues of material fact as to whether her newly alleged injuries are causally connected to her history of sexual abuse. The trial court erred by holding that the claim is time-barred.

2.     Evidence of Reports to OBC Triggering a Duty to Report

Rashandra lived in the Robinsons' home from November 1993 to March 1994 and March 1994 to November 1998. She stated that she made reports of sexual abuse to her SMH counselor. However, Rashandra's answers to interrogatories incorporated her medical records and stated that she did not recall specific OBC employees to whom she had reported abuse.

Rashandra provided evidence of reporting physical abuse and neglect to OBC:

> In addition to the many others I told about the abuse that was going on in the Robinson home. I told Odessa Brown staff that Tracy and Henry were constantly hitting me and the other children in the home. I told Odessa Brown that the Robinson[s] routinely belittled all of us kids about the facts that landed us in foster care. The Robinson[s] did not feed us daily and at times leave us alone in the house or outside while they were away from the home. Also, see attached reports from my records.

32

In her declaration in response to OBC's motion for summary judgment

Rashandra reiterated this statement and added a specific time frame for her

report:

> I believe that I first reported to the medical staff likely during my visit about bed wetting that occurred in September of 1997 when being asked about things that were bothering me. The records from the time indicate that we discussed my history of abuse, including sexual, and that I had been in the Robinson home for at least four (4) years at the time.[21]

In addition to her history of abuse, Rashandra reported ongoing

"mistreatment" and abuse at the Robinson home:

> It is my recollection that at this, or a similar visit, I discussed mistreatment in the home at the time, and the medical providers seeming like they did not believe me. I was a child and always taken to the visits by a foster parent, one of the Robinsons. The Robinsons would always suggest that my descriptions of the abuse was from my prior homes when that was not true. My recollection is that when I would discuss what was happening to me at home, whichever foster parent was with me would explain that I was recounting a history from a prior placement or that I was simply not telling the truth.

In a deposition, Rashandra testified that she informed an OBC doctor

named Brown about the sexual abuse. A medical provider, Cynthia Brown,

began working at OBC in August 1998, almost a year after the September 1997

visit when Rashandra alleges she first reported the Robinsons' abuse.[22]

---

[21] The declaration contains an excerpt from a medical record relating past history as "significant for this child being sexually abused, emotionally abused, and also physically abused. She has been in this foster home for the past 4 years and seems to have a good relationship with the foster mom."

[22] Moreover, the available medical records show Rashandra's first visit with Brown was in October 2001, almost three years after she was removed from the Robinson home, and they do not include any reports of sexual abuse.

Rashandra resided at the Robinson home from March 1994 to November 1998. While the evidence indicates Brown was not the provider to whom Rashandra disclosed abuse in September 1997, Rashandra provided evidence that indicates that she reported abuse to OBC during the time she was placed with the Robinsons.[23]

Viewing the evidence in the light most favorable to Rashandra as the nonmoving party, the record includes evidence of reports of abuse to OBC during the time she lived at the Robinson home. This evidence creates a genuine issue of fact as to whether OBC had a duty to report her abuse and whether its failure to report has a causal connection to her injuries. The trial court erred by dismissing Rashandra's claims on summary judgment.

E.    Edward Walker

Edward alleged sexual abuse in the Robinson foster home, where he lived from March 1994 to May 1998. His answer to OBC's interrogatories incorporated his medical records and stated that he cannot recall specific OBC employees to whom he disclosed the abuse. In addition, his interrogatory answer described a specific incident highlighting physical abuse in the Robinson home:

> I tried to escape the Robinson home by climbing out the window using a sheet. I let go too soon and dropped to the ground

---

[23] The record also contains a 1995 neuropsychological evaluation from Harborview Medical Center. The report notes that Ms. Robinson reported that Rashandra was allegedly sexually, physically, and mentally abused and neglected. The report also states that Rashandra's younger brother, Edward, had been sexually abused by his mother and uncle. Additionally, a July 1996 letter to Seattle Mental Health from a CPS caseworker includes "recent disclosure of sexual abuse to the foster parents" among Rashandra's "additional stressors." But these records from other providers do not establish that OBC, as opposed to Harborview, had received a report of abuse sufficient to trigger the reporting duty.

and sprain[ed] my ankle and was sent to Children's Hospital. Tracy and Henry told Children's hospital that I tried to commit suicide. I told the staff at Children's hospital that the Robinson's were not telling the truth, but that in fact I wasn't trying to kill myself but rather I was trying to escape the home. I told the staff about the physical and mental abuse that I and the other kids endured at the hands of Tracy, Henry and Isaac while living in the Robinson home.

According to Edward, Seattle Children's Hospital[24] reported his statements to the proper authorities, and he was removed from the Robinson home. Therefore, Seattle Children's Hospital complied with the mandatory reporting requirements, which resulted in Edward's removal from the Robinson home.

In response to the motion for summary judgment, Edward filed a declaration stating that he had been an OBC patient between 1989 and at least 1998. He states, "I believe that I first reported to the medical staff when I attended for medical visits as early as 1998 when I was placed in the Robinson home." But Edward did not describe the content of the reports and to whom he reported.

In support of the motion for reconsideration in this case, Edward submitted his inpatient psychiatry discharge summary from May 1998, which summarized his hospital stay at Seattle Children's after his escape and removal from the Robinson home.[25] After his stay, Edward was discharged to a DCFS worker and did not return to the Robinson home.

---

[24] Seattle Children's Hospital did business as OBC, so while we distinguish it as a provider, for purposes of liability in this lawsuit, Seattle Children's Hospital and OBC are the same entity.

[25] The report included a history of abuse but does not state that this abuse was reported before his admission to Seattle Children's. For instance, it states, "Edward was admitted to the IPU with an extensive history of physical and sexual abuse by his biological parents." The report

Edward submitted a second declaration, claiming that the medical records corroborate his claims of reported sexual abuse. He stated that Raeshari's medical record demonstrates that providers were informed of sexual abuse by the Robinsons of both him and Raeshari on December 15, 1994. Raeshari was taken to the Seattle Children's emergency room with significant mental health symptoms. The consultation report states, "Another triggering event may be the fact that pt's 5 y/o brother (whom she shares a room w/ at foster home) disclosed to foster parents he had been sexually abused by extended family members." As with the other records provided, this report describes abuse in the past by people other than the foster family, without referencing any specific dates. At the time of the report in Raeshari's medical record, December 1994, Edward had been in foster care, and away from his biological family, for over six months. With the disclosures attributed to abuse by "extended family members," OBC would not have been alerted to abuse by the Robinsons. Therefore, this disclosure by Raeshari would not provide evidence of abuse that triggered OBC's duty to report.

Additionally, there is insufficient evidence to establish an issue of fact as to causation, as any report of sexual abuse inflicted by his biological family would not have resulted in investigation of the foster home. Thus, Edward cannot prove

---

further notes that "[t]here is a history of both physical and sexual abuse for this child. Details regarding the abuse are not available." The sexual abuse mentioned in this report is described as "history," i.e., in the undefined past, with no mention of whether it was reported prior to that evaluation, and without discussing any more recent evidence of abuse at the Robinson home.

that OBC's failure to report this abuse resulted in his continued residence in the foster home. The trial court properly granted summary judgment as to Edward's claim.

F.    Lakieta Finister

Lakieta lived in the Robinson foster home from August 1995 to November 1997. In her answers to interrogatories, she stated that she did not recall names of specific OBC employees to whom she reported the Robinsons' abuse. She also stated that she had corroborating medical records from Harborview Sexual Assault Center that document abuse, and the record contains Lakieta's medical reports from a March 1996 visit to Harborview. The sexual assault examiner notes:

> There is great concern for neglect of her physical and emotional needs based on a report that this child was left unattended in a very public area for a matter of hours to days before she was placed in a foster home. This is a much more concerning situation than the limited disclosure of sexual abuse that we are given today.

The evaluation notes "concern of a history of sexual abuse" as the chief complaint. The report details unusual behavior observed by the Robinsons when Lakieta came to live in their foster home. According to the Robinsons, Lakieta displayed sexualized behavior including masturbation in inappropriate places and was receiving counseling at Seattle Mental Health. The nurse practitioner interviewed Lakieta and reported "[t]his child gives a history of being touched in the genital area by a strange man."

These medical records indicate that Lakieta likely experienced sexual abuse at some point in her early childhood. However, the records do not establish that OBC received any reports of this abuse that would trigger the duty to report. Harborview Medical Center, rather than OBC or Seattle Children's, conducted the examination, and there is no evidence that Harborview communicated the information to OBC. The Harborview medical records are insufficient to create a question of fact as to whether OBC had a duty to report.

Lakieta also relies on the declarations and medical records of her older sister, Tiffany, in support of her claim that OBC owed her a duty to report sexual abuse. In the general response to OBC's interrogatories, Lakieta stated that she could not recall specific OBC employees and incorporates her records. She notes, "[t]he reports are included in my sister's Odessa Brown records," and includes a March 1996 chart notation from Tiffany's medical records. The notes states "child gives [history] of being touched by men." Like the records discussed above, this notation is a Harborview Medical Center record, rather than an OBC record. Additionally, any evidence of sexual abuse in Tiffany's records triggers the duty to report on Tiffany's behalf, rather than a duty to Lakieta. Lakieta has not provided evidence of a report of sexual abuse that would have triggered OBC's duty to report. Because Lakieta has not established a duty to report, OBC was entitled to summary judgment dismissal of her claims.

CONCLUSION

In order to defeat summary judgment, the Appellants needed to introduce evidence to show specific facts establishing that OBC had reasonable cause to believe each of them had been subjected to abuse or neglect, triggering a duty to report, and that OBC's breach of that duty caused injury. DeShaye and Rashandra have provided evidence that they reported abuse to OBC within the time they resided with their abusers. Therefore, we reverse the trial court's dismissal of their claims and remand for further proceedings.

The record does not show a genuine issue of material fact as to the claims by Monique, Tiara, Edward, and Lakieta. The trial court properly granted summary judgment and dismissed their claims.

Affirmed in part, and reversed in part.

_____
Chung, J.

WE CONCUR:

_____     _____
Coburn, J.                          Mann, J.